**No. 25-1672**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

DEBRA GOULART, individually and on behalf of all others similarly situated; MICHAEL GARBITT, individually and on behalf of all others similarly situated,

Plaintiffs – Appellants,

JANE DOE; JOHN DOE; JANET DOE,

Plaintiffs,

v.

CAPE COD HEALTHCARE, INC.,

Defendant – Appellee.

---

On Appeal from
United States Court for the District of Massachusetts
No.: 25-cv-10445-RGS

---

**BRIEF OF APPELLANTS**

---

Antonio Xavier Milton
Ahmad Zavitsanos & Mensing, P.L.L.C.
1221 McKinney Street
Houston, TX 77010
713-655-1101

**TABLE OF CONTENTS**

**Contents**                                                                                  **Pages(s)**

TABLE OF CONTENTS ......................................................................... 1

TABLE OF AUTHORITIES ..................................................................... 3

STATEMENT IN SUPPORT OF ORAL ARGUMENT ............................. 8

INTRODUCTION ................................................................................... 9

JURISDICTIONAL STATEMENT ........................................................ 13

STATEMENT OF THE ISSUES ............................................................ 14

STATEMENT OF THE CASE ................................................................ 15

    I.   Cape Cod shared its patients' health information with Facebook and Google by secretly deploying tracking technologies on its website and patient portal. ..................................................................... 15

    II.  Facebook's and Google's surreptitious tracking technologies. .......... 16

    III. Cape Cod misled the public in its Privacy Policies about its decision to share patients' health information with Facebook and Google. .............. 20

    IV. Cape Cod exploited its patients' protected health information for commercial advantage by bartering that information to Facebook and Google in return for marketing benefits. ................................................. 21

    V.  Plaintiffs filed suit after learning Cape Cod had shared their protected health information with Facebook and Google. ..................................... 22

SUMMARY OF THE ARGUMENT ......................................................... 24

ARGUMENT ......................................................................................... 26

    I.   Cape Cod's conduct violated both HIPAA's criminal liability provisions and state tort law, establishing the predicate for the crime-tort exception. ............................................................................................. 26

1

a.  HIPAA makes it a crime for healthcare providers to share patients' protected health information without authorization, with enhanced penalties if done for commercial advantage. ....................................... 26

b.  Cape Cod also committed multiple torts against Plaintiffs and other patients under Massachusetts law ............................................... 29

II.  The District Court erred by ignoring Section 1320d-6 of HIPAA, which imposes heightened criminal penalties where protected health information is knowingly disclosed "for commercial advantage." .............. 29

III.  The District Court further erred because it misconstrued the crime-tort exception, which does not carve out crimes or torts done with "commercial purpose." ............................................................................................. 31

a.  The crime-tort exception simply applies where the defendant's purpose was to commit a separate crime or tort with the intercepted communication. ............................................................................... 31

b.  The District Court misapplied an inapposite "primary motivation"/"determining factor" test for the crime-tort exception. Properly applied, that test still warrants reversal. ................................ 34

IV.  Independently but relatedly, the District Court erred because it imposed an improper *mens rea* requirement that does not exist under the Wiretap Act. .......................................................................................... 36

V.  The District Court ignored that disclosure is an independent act separate from interception. .................................................................... 39

VI.  The District Court misapplied the Rule 12(b)(6) standard. ............... 40

CONCLUSION ............................................................................................... 46

CERTIFICATE OF SERVICE ....................................................................... 48

CERTIFICATE OF COMPLIANCE .............................................................. 48

ADDENDUM .................................................................................................. 49

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*A.D. v. Aspen Dental Mgmt., Inc.*,
No. 24 C 1404, 2024 WL 4119153 (N.D. Ill. Sept. 9, 2024)........................ 33

*Alberts v. Devine*,
79 N.E.2d 113 (Mass. 1985) ................................................................. 29

*Anthony v. Sundlun*,
952 F.2d 603 (1st Cir. 1991)................................................................. 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................ 41

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) .................................................................. 45

*Brahm v. Hosp. Sisters Health Sys.*,
23-cv-444-wmc, 2024 WL 3226135 (W.D. Wis. June 28, 2024)................. 33

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) ............................................................................ 32

*Carcieri v. Salazar*,
555 U.S. 379 (2009) ............................................................................ 31

*Caro v. Weintraub,*
618 F.3d 94 (2d Cir. 2010)................................................................... 32

*Castillo v. Costco Wholesale Corp.*,
CASE NO. 2:23-cv-01548-JHC, 2024 WL 4785136 (W.D. Wash. Nov. 14,
2024) ............................................................................................33, 36

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024)....................................32, 34, 35, 39

*Dean v. Kaiser Found. Health Plan, Inc.*,
  Case No. 5:22-cv-00278-MCS-KK, 2022 WL 18938253 (C.D. Cal. Nov. 22, 2022) ................................................................................. 28

*Dinerstein v. Google, LLC*,
  484 F. Supp. 3d 561 (N.D. Ill. 2020), *aff'd as modified*, 73 F.4th 502 (7th Cir. 2023) ................................................................................. 29

*Doe v. Tenet Healthcare Corp.*,
  No. 1:23-CV-01106-DC-CKD, 2025 WL 1635956 (E.D. Cal. June 9, 2025) ................................................................................. 33

*Garcia-Catalan v. United States*,
  734 F.3d 100 (1st Cir. 2013) ................................................................ 41

*Gay v. Garnet Health*,
  23-cv-06950 (NSR), 2024 WL 4203263 (S.D.N.Y. Sept. 16, 2024) ........ 33, 40

*Grajales v. P.R. Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012) ................................................................ 41

*Hartley v. Univ. of Chi. Med. Ctr.*,
  Case No. 22 C 5891, 2024 WL 1886909 (N.D. Ill. Apr. 30, 2024) ............. 33

*In re DoubleClick Inc. Priv. Litig.*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001) ................................................... 36

*In re Grp. Health Plan Litig.*,
  709 F. Supp. 3d 707 (D. Minn. 2023) .......................................32, 43, 44, 45

*In re Meta Pixel Healthcare Litig.*,
  647 F. Supp. 3d 778 (N.D. Cal. 2022) .................................................. 28

*In re Pharmatrak, Inc.*,
  329 F.3d 9 (1st Cir. 2003) ................................................................... 12

*Jarrell v. Adena Health Sys.*,
  Case No. 2:24-cv-00282, 2025 WL 81304 (S.D. Ohio Jan. 13, 2025) ......... 40

*Kane v. Univ. of Rochester*,
2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) ......................................... 33

*Kurowski v. Rush Sys. for Health*,
No. 22 C 5380 (N.D. Ill. Dec. 11, 2023)..................................... 33, 36, 37

*Littlefield v. Mashpee Wampanoag Indian Tribe*,
951 F.3d 30 (1st Cir. 2020) ...................................................................... 31

*Lugo v. Inova Health Care Servs.*,
No. 1:24-cv-700 (PTG/WEF), 2025 WL 905191 (E.D. Va. Mar. 25, 2025) 33

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024).................................................33, 36

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011) ........................................................................ 41

*R.S. v. Prime Healthcare Servs., Inc.*,
Case No. 5:24-cv-00330-ODW (SPx), 2025 WL 103488 (C.D. Cal. Jan. 13,
2025).......................................................................................... 33, 35, 40

*Riganian v. LiveRamp Holdings, Inc.*,
No. 25-CV-00824-JST, 2025 WL 2021802 (N.D. Cal. July 18, 2025)......... 36

*Rodriguez-Reyes v. Molina-Rodriguez*,
58 F.4th 517 (1st Cir. 2023) ..................................................................... 42

*Sartori v. Schrodt*,
No. 3:18-cv-204-RV-CJK, 2018 WL 11209992 (N.D. Fla. May 22, 2018).. 43

*SEC v. Lipson*,
278 F.3d 656 (7th Cir. 2002)..................................................................... 36

*Smith v. Loyola Univ. Med. Ctr.*,
No. 23 CV 15828, 2024 WL 3338941 (N.D. Ill. July 9, 2024).................... 33

*Stein v. Edward-Elmhurst Health*,
Case No. 23-cv-14515, 2025 WL 580556 (N.D. Ill. Feb. 21, 2025)  37, 38, 39,
45

*Sussman v. Am. Broad. Companies, Inc.*,
  186 F.3d 1200 (9th Cir. 1999) ...................................................... 35, 36, 45

*Sweat v. Hous. Methodist Hosp.*,
  Civil Action No. H-24-775, 2024 WL 3070184 (S.D. Tex. June 20, 2024).. 33

*United States v. Dale*,
  991 F.2d 819 (D.C. Cir. 1993) ................................................................. 34

*United States v. McHugh*,
  57 F. Supp. 3d 95 (D. Mass. 2014) ......................................................... 34

*W.W. v. Orlando Health, Inc.*,
  Case No: 6:24-cv-1068-JSS-RMN, 2025 WL 722892 (M.D. Fla. Mar. 6,
  2025) ...............................................................................................33, 43

## Statutes

18 U.S.C. § 2511 ....................................................................... 10, 14, 25

18 U.S.C. § 2511(2)(d).................................................................. 37, 38, 39

18 U.S.C. § 2511(d)................................................................................ 31

28 U.S.C. § 1291 ................................................................................... 13

28 U.S.C. § 1447(d)............................................................................... 13

42 U.S.C. § 1320d-6 ....................................................................... passim

42 U.S.C. § 1320d-6(b)(3) ..................................................................... 30

MASS. GEN. LAWS. ch. 111, § 70E .......................................................... 29

Pub. L. 99-508, § 191, 100 Stat. 1848, 1850 (1986)...................................... 38

## Other Authorities

MODEL PENAL CODE § 2.02(a)(ii) ............................................................ 42

## Rules

FED. R. CIV. P. 8(a)............................................................................... 41

**Regulations**

45 C.F.R. § 160.103 ................................................................26, 27

45 C.F.R. § 164.502 ................................................................. 26

45 C.F.R. § 164.502(a)(5)(ii) ................................................... 28

45 C.F.R. § 164.508(a)(1) ........................................................ 26

45 C.F.R. § 164.514 ................................................................. 27

45 C.F.R. § 164.514(b)(2)(i) ...............................................26, 27

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs request oral argument because the District Court's errors raise federal statutory interpretation issues of first impression in this Circuit, warranting this Court's clarification of the correct interpretation of HIPAA and the Wiretap Act as set forth below.

8

**INTRODUCTION**

Cape Cod is a Massachusetts healthcare system that serves tens of thousands of patients each year. If Cape Cod secretly printed copies of its communications with patients disclosing details like their doctors, medical conditions, and treatments, and then mailed those records to Facebook and Google, there would be no dispute that Cape Cod had committed multiple crimes and torts. This would be true even—or indeed, especially—if Cape Cod did so for pecuniary motives.

Yet the District Court found that the *same conduct* was neither a crime nor a tort when accomplished digitally via surreptitious tracking technologies that Cape Cod deployed on its website and password-protected patient portal. Specifically, it held that Cape Cod's decision to share its patients' protected health information with Facebook and Google for "commercial gain" was insufficient to satisfy the crime-tort provision of the Federal Wiretap Act. Appx.8. In so ruling, the District Court erred for four independent, though interrelated, reasons.

*First*, under the Health Insurance Portability and Accountability Act ("HIPAA"), it is a federal crime for a healthcare provider like Cape Cod to knowingly "sell, transfer, or use individually identifiable health information" without patients' consent, and such disclosure is subject to enhanced penalties if

done "for commercial advantage." 42 U.S.C. § 1320d-6. Ignoring HIPAA's plain text, the District Court nevertheless concluded that Cape Cod's decision to barter its patients' health information to Facebook and Google for "commercial gain" was not a crime. Because the District Court's ruling cannot be squared with the plain text of the relevant statute (or indeed the terms of its own ruling), it should be reversed.

*Second*, the District Court similarly erred by reading a "commercial purpose" exception into the crime-tort provision of the Wiretap Act. The crime-tort provision states that it is unlawful for a party to intercept an electronic communication "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511. No "commercial purpose" exception to the crime-tort provision appears anywhere in the Wiretap Act.

Nevertheless, the District Court held that, if a party like Cape Cod intercepts another's communications for the "purpose" of making money (rather than the purpose of "breaking the law"), then such conduct is neither a crime nor a tort. Effectively, this is like saying that if a bank robber holds up a bank "to get money" (rather than to commit bank robbery), no crime has occurred. Dozens of courts across the country have rejected this reasoning. Those courts have held that the mere existence of one alleged legitimate motivation for

committing a crime or tort is insufficient to excuse a party from liability under the Wiretap Act. Because a court may not read exceptions into a federal statute that appear nowhere in the text, this Court should similarly reject the District Court's attempt to fashion a "commercial purpose" exception to the crime-tort provision out of thin air.

*Third*, the District Court read an improper *mens rea* requirement into the Wiretap Act. The statute's plain language requires only that the purpose of the interception is to commit an act, and that the act is criminal or tortious—not that the intercepting party have an intent to commit a crime or tort.

*Fourth*, the District Court ignored that disclosure is an independent act separate from interception. Under the Wiretap Act, disclosure of patient health information in violation of HIPAA constitutes a further impropriety independent and separate from the interception, even though it occurs near-instantaneously.

The District Court compounded these errors by misapplying Rule 12(b)(6) when it ignored scores of non-conclusory factual allegations in Plaintiffs' complaint. Those allegations laid out Cape Cod's scheme to surreptitiously intercept, disclose, and profit from bartering its patients' health information to Facebook and Google (without patients' consent) in exhaustive detail. Because the District Court failed to indulge all rational factual inferences in Plaintiffs'

11

favor in deciding the motion to dismiss, the District Court's ruling should be reversed.

At bottom, Plaintiffs' claims are not novel. They align with First Circuit precedent established more than twenty years ago affirming that healthcare providers cannot secretly exploit consumers' health information. *In re Pharmatrak, Inc.*, 329 F.3d 9, 21 (1st Cir. 2003). The District Court's order conflicts with First Circuit precedent and the plain language of the relevant statutes and the vast weight of authority interpreting them. This Court should hold that federal law does not permit healthcare providers like Cape Cod to barter their patients' health information to tech companies like Facebook and Google without patients' knowledge or consent.

## JURISDICTIONAL STATEMENT

28 U.S.C. § 1291 vests this Court with jurisdiction to hear this appeal because the District Court's dismissal of claims with prejudice is a final judgment. Because this action was removed on the basis of federal question jurisdiction, this Court has jurisdiction to hear this appeal of the final judgment under 28 U.S.C. § 1447(d).

## STATEMENT OF THE ISSUES

I.  The Federal Wiretap Act prohibits a party from intercepting a communication "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). HIPAA makes it a criminal offense for a healthcare provider to disclose protected health information "for commercial advantage" without express consent. Plaintiffs alleged that Cape Cod deployed surreptitious tracking technologies on website for the purpose of exchanging its patients' protected health information with third-parties for marketing benefits. Plaintiffs asserted that these unauthorized disclosures of health information constituted multiple torts, including invasion of privacy and breach of confidentiality. Did the District Court err in holding that allegations detailing Cape Cod's intentional criminal and tortious actions could not satisfy the crime-tort provision of the Wiretap Act?

## STATEMENT OF THE CASE

**I.**　　**Cape Cod shared its patients' health information with Facebook and Google by secretly deploying tracking technologies on its website and patient portal.**

Cape Cod owns and operates multiple hospitals and medical centers in Massachusetts. Appx.743. As part of the medical services it offers patients, Cape Cod maintains a website, www.capecodhealth.org, and a password-protected patient portal. Appx.745-46. Cape Cod's website and patient portal are designed for use by patients, and Cape Cod actively encourages patients to utilize the digital tools on its website and patient portal to receive healthcare services. Appx.746. Cape Cod's website includes tools for patients to find a doctor, research services and treatments, and pay bills. *Id.* Similarly, after patients sign in using login credentials, Cape Cod's patient portal allows them to make appointments, access medical records, view lab results, and communicate with their healthcare providers. *Id.*

Cape Cod designed its website and patient portal for interactive communications with patients related to their specific conditions and healthcare needs. Appx.746. For example, patients can use the "Find a Provider" functionality on the website to search for a healthcare provider by inputting personal details, such as their health conditions, their hometown, and their language preference. Appx.769-770. Patients can also use the website's general

15

"Site Search" function to input details about their health conditions, such as typing a query for "substance abuse" or "cancer care," to receive information about treatment options. Appx.770-771. Likewise, Cape Cod encourages patients to exchange communications with their doctors from inside the password-protected patient portal. Appx.746. Cape Cod also encourages patients to pay bills, make appointments, and access their medical records by typing information into the password-protected portions of its websites, requesting data from Cape Cod, and then accessing the results online. Appx.772-774. All the information that Cape Cod encourages its patients to share via its website and portal is considered protected health information under HIPAA.

Plaintiffs used Cape Cod's website and patient portal to search for providers, schedule appointments, pay for medical services, review medical records and test results, and research treatment options. Appx.744. Plaintiffs allege that, using two surreptitious tracking technologies, the Facebook Meta Pixel and Google Analytics, Cape Cod bartered their protected health information to Facebook and Google without their knowledge, consent, or express written authorization. Appx.744-745; Appx.768-778.

## II.    Facebook's and Google's surreptitious tracking technologies.

Facebook (also known as "Meta") and Google are two of the world's largest advertising companies. To power their businesses, Facebook and Google

16

encourage companies to deploy tracking technologies on their websites that collect data about individual users. Appx.758-766; Appx.776-777. Facebook and Google use the data they collect from individuals to create user profiles, which can then be used to target individuals more effectively with advertising for products and services. Appx.776-777.

The tracking technologies that Facebook and Google make available to website owners like Cape Cod are bits of code that companies can integrate into their websites, thereby enabling the interception and disclosure of user activity on those platforms. Appx.748-749. These tracking technologies are specifically designed to transmit information from users' browsers to Facebook and Google. Appx.750. Indeed, Facebook and Google warn website developers that deploying their technologies on a website will result in users' personally identifiable information being disclosed to them. Appx.750; Appx.763. For just this reason, Google also cautions web-developers that Google tracking technologies are inappropriate for health-related websites. Appx.776.

Cape Cod, however, ignored these warnings. It chose to deploy the Meta Pixel and Google Analytics on its website and inside its patient portal. Appx.749; Appx.777. These tracking technologies function by embedding code on a web page to create 1x1 pixels that appear as a small, camouflaged dot on a user's screen called tracking pixels. Appx.750. Tracking pixels are completely

17

invisible to website users. *Id.* Each time a user interacts with a web page with an embedded tracking pixel, software code is triggered which tracks, intercepts, records, and transmits user data from the web page. *Id.* These tracking pixels collect and transmit dozens of data points about individual website users who interact with a website. *Id.*

For example, the Meta Pixel that Cape Cod deployed on its website "tracks the people and the type of actions they take" on the site. Appx.761. The Meta Pixel surreptitiously captured patients' activities and inputs on the site, including the pages they visit, the buttons they click, the contents of their search queries, and the information patients type into forms. Appx.764. The Meta Pixel also collected personal information about the patients, such as their name, IP address, email, phone number, patient status, the type of medical appointment they made, the date, the specific doctor the patient was seeing, their browser settings, and the detailed, full-string URLs being shared between the patient and Cape Cod's servers. Appx.747-748; Appx.764-765. Facebook then compiled this data and associated it with patients' individual Facebook profiles. Appx.764-765. This sensitive information was instantaneously transmitted to Facebook every time a patient interacted with the Cape Cod website. Appx.768.

Cape Cod also used Google Analytics to track and disclose patients' IP addresses, cookies, geolocation, and other unique identifiers. Appx.751. In

addition to Google Analytics, Cape Cod deployed Google Tag Manager on its websites through an "iframe"—an invisible window through which Cape Cod funneled tracking pixels for third parties to secretly acquire the content of patient communications. Appx.752.

Both the Meta Pixel and Google Analytics operated surreptitiously without patients' consent, knowledge, or authorization. The Meta Pixel and Google Analytics tracking tools functioned by instructing patients' browsers to share every communication they made with Cape Cod's website with Facebook's and Google's servers. Appx.750-751. These transmissions contained not only the original electronic communications that patients made (in the form of GET requests and HTTP requests) but also a host of additional identifying data that the Meta Pixel and Google Analytics are designed to capture. Appx.750-758.

This surreptitious interception and disclosure of patients' protected health information were never disclosed or agreed to by patients. Appx.751. Cape Cod enabled these interceptions and disclosures without any affirmative action taken by the patient. Appx.106. Worse, because Cape Cod disguised the third-party Facebook and Google cookies downloaded onto patients' browsers as first-party cookies, patients who attempted to prevent unauthorized tracking by deleting or

blocking third-party cookies nevertheless had their protected health information shared with Facebook and Google. Appx.756.

### III. Cape Cod misled the public in its Privacy Policies about its decision to share patients' health information with Facebook and Google.

Cape Cod's patients had no idea that Cape Cod was routinely bartering their protected health information to Facebook and Google in return for advertising benefits. Appx.778-781.

Nothing on the Cape Cod website alerted patients to the fact that Cape Cod had deployed the Meta Pixel and Google Analytics on its website and patient portal. Appx.779. Nor did Cape Cod's "Privacy Policy" warn patients that Cape Cod was routinely disclosing their individually identifiable health information for marketing purposes. Cape Cod instead promised its patients that it was "committed to protecting the privacy and security of the users of our internet site." Appx.742. It likewise promised that it was "committed to protecting the identities of visitors to [its] site." *Id.*

Contrary to those promises, Cape Cod routinely shared patients' health information with Facebook and Google, along with prohibited identifiers such as patients' IP addresses, device identifiers, Facebook IDs, and cookies that permitted Facebook and Google to link the data it received to patients' Facebook and Google accounts. Appx.752-758; Appx.764-766; Appx.770; Appx.776.

**IV.** **Cape Cod exploited its patients' protected health information for commercial advantage by bartering that information to Facebook and Google in return for marketing benefits.**

Cape Cod bartered its patients' protected health information to Facebook and Google in return for enhanced marketing and advertising benefits, including analytics data that allowed Cape Cod to optimize its website and marketing campaigns, free access to Google Analytics and Facebook's Meta Pixel software, and the ability to run targeted social media advertising campaigns, which were facilitated by the cookies and tracking pixels that Facebook and Google provided. Appx.763; Appx.786; Appx.776-778. In turn, Facebook and Googe monetized the patient health data they received from Cape Cod by selling advertising to third parties that was customized to patients' specific medical conditions, behaviors, and habits. Appx.753-754; Appx.758-760; Appx.766. Insofar as patients' health information allows companies to gain insight into potential customers, target custom audiences, and boost revenues, this data is both valuable and monetizable. Appx.784-786.

None of this is theoretical. For example, Plaintiff Debra Goulart alleges that, after using Cape Cod's website to research treatment options for knee replacement, she began receiving online advertisements related to her research, including advertisements for knee-pain remedies. Appx.744. Nor is Ms. Goulart's experience surprising.

21

When a Cape Cod website visitor is a Facebook user, the health data that Cape Cod shared with Facebook is associated with the visitor's Facebook ID. Appx.764. The Facebook ID captures the user's name and Facebook profile, which contains demographic and other information about the user, including their real-world identity. Appx.757. Facebook collects and monetizes this data regardless of whether a visitor has a Facebook account by matching the data to "shadow profiles" that Facebook has admitted it maintains for nonusers of Facebook. Appx.764. After receiving transmissions from Cape Cod's website, Facebook processes, analyzes, and assimilates patients' data into data sets like "Core Audiences" and "Custom Audiences" to sell advertising. Appx.766-770.

Cape Cod knew that, by deploying the Meta Pixel and Google Analytics on its website, it would be sharing patients' protected health information with Facebook and Google. Appx.760; Appx.777-778. Indeed, the Meta Pixel and Google Analytics are literally designed to share user data with Facebook and Google. Appx. 750; Appx.764; Appx.776-778.

## V.     Plaintiffs filed suit after learning Cape Cod had shared their protected health information with Facebook and Google.

Plaintiffs Michael Garbitt and Debra Goulart filed suit after learning that Cape Cod had sold their protected health information to Facebook and Google in exchange for marketing benefits.

22

Cape Cod moved to dismiss Plaintiffs' Federal Wiretap Act claims, contending that they failed to adequately allege the crime-tort exception to the one-party consent defense. Appx.694. Cape Cod asserted that the Second Amended Complaint did not plausibly allege that Cape Cod intended to commit a crime or a tort at the time it intercepted Plaintiffs' communications. Appx.701.

In opposition, Plaintiffs emphasized the scores of factual allegations demonstrating how the web tracking tools worked, the public discourse revealing that these tools violated HIPAA, and that Cape Cod deployed analytics technologies on its website and patient portal—despite knowing that Facebook and Google were routinely receiving patients' health information. Appx.712-15. Plaintiffs further emphasized that the Second Amended Complaint sufficiently pleaded allegations showing that Cape Cod had knowingly disclosed its patients' health information without consent in exchange for marketing benefits in violation of both state and federal law. Appx.717-18.

The District Court granted Cape Cod's motion to dismiss on the grounds that Plaintiffs had "failed to plausibly allege" that Cape Cod's "primary motivation" in disclosing Plaintiffs' personal health information was for "the purpose of committing a criminal violation or tort, as opposed to commercial gain or convenience." Appx.8.

23

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing Plaintiffs' Federal Wiretap Act claim because, fundamentally, Cape Cod's actions were both criminal and tortious even if done for pecuniary motives. They fall within the crime-tort exception to the Federal Wiretap Act's one-party consent rule. In holding to the contrary, the District Court disregarded the plain language of HIPAA and the Federal Wiretap Act in four distinct ways, each interrelatedly but independently erroneous.

*First*, HIPAA expressly criminalizes Cape Cod's conduct. HIPAA provides that it is a federal crime for a healthcare provider like Cape Cod to "sell, transfer, or use individually identifiable health information" without patients' consent, with heightened penalties if done "for commercial advantage." 42 U.S.C. § 1320d-6. Despite the benefit of briefing on this issue, Appx.713; Appx.716, the District Court completely ignored this statutory provision, which under the District Court's own reasoning would have warranted denying Cape Cod's motion to dismiss.

*Second*, the District Court improperly read a non-existent "commercial gain" exception into the Wiretap Act. The Wiretap Act makes it unlawful for a party to intercept an electronic communication "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United

24

States or of any State"—full stop. 18 U.S.C. § 2511. The District Court improperly disregarded this in holding that Cape Cod's disclosure of patients' health information for "commercial purposes" was "not the stuff of which a crime-tort is made." Appx.10.

*Third*, the District Court read an improper *mens rea* requirement into the Wiretap Act that, again, does not exist in the plain language of the statute.

*Fourth*, the District Court failed to acknowledge that disclosure to a third party is an independent act separate from first-party interception even though technology permits both acts to occur at the same time.

In addition to committing these legal errors, the District Court improperly disregarded the multitude of factual allegations Plaintiffs made explaining how Cape Cod's deliberate actions resulted in various tort and criminal violations, and further failed to indulge reasonable inferences in Plaintiffs' favor, in contravention of the Rule 12(b)(6) pleading standard.

For all these reasons, this Court should vacate the District Court's judgment and remand to allow Plaintiffs to proceed on their Wiretap Act claim.

## ARGUMENT

**I.    Cape Cod's conduct violated both HIPAA's criminal liability provisions and state tort law, establishing the predicate for the crime-tort exception.**

    **a.    HIPAA makes it a crime for healthcare providers to share patients' protected health information without authorization, with enhanced penalties if done for commercial advantage.**

Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public health information about a patient, a potential patient, or a household member of a patient for marketing purposes without a patient's express written authorization. 45 C.F.R. § 164.502; 45 C.F.R. § 164.508(a)(1); 45 C.F.R. § 164.514(b)(2)(i). The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically." *Id.*

The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. IIHI is defined as "a subset of health information, including demographic information collected from an

26

individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

HIPAA's "De-Identification" rule expressly forbids healthcare providers like Cape Cod from sharing IIHI with third parties without patient authorization. 45 C.F.R. § 164.514. To effect that rule, HIPAA provides a list of 18 prohibited "identifiers" that healthcare providers are required to remove before sharing any health information with a third party. 45 C.F.R. § 164.514(b)(2)(i). Those prohibited identifiers include "Names;" "Electronic Mail Addresses;" "Internet Protocol (IP) address numbers;" "Device Identifiers;" "Web Universal Resource Locators (URLs);" and "[a]ny other unique identifying number, characteristic, or code." *Id.*

Under HIPAA, it is a federal crime to "knowingly" disclose "individually identifiable health information to another person." 42 U.S.C. § 1320d-6. A person or entity who violates 42 U.S.C. § 1320d-6 "with the intent to sell, transfer, or use individually identifiable health information for commercial

27

advantage" is subject to enhanced penalties—a fine of "not more than $250,000," imprisonment of "not more than 10 years," or both. *Id.*

As a result, it is illegal for a healthcare provider like Cape Cod to sell patient lists to third parties without patients' express authorization. This includes lists such as patient names and the fact that they were admitted to a specific medical facility. *See Dean v. Kaiser Found. Health Plan, Inc.*, Case No. 5:22-cv-00278-MCS-KK, 2022 WL 18938253, at *9 (C.D. Cal. Nov. 22, 2022). That is because "patient status" itself is protected against unauthorized disclosure under HIPAA. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792 (N.D. Cal. 2022) ("[P]atient-status constitutes protected health information.").

HIPAA defines the prohibited "sale of protected health information" broadly. 45 C.F.R. § 164.502(a)(5)(ii). Under HIPAA, a "sale" of protected health information means "a disclosure of protected health information by a covered entity or business associate, if applicable, where the covered entity or business associate **directly or indirectly** receives remuneration from or on behalf of the recipient of the protected health information in exchange for the protected health information." *Id*. (emphasis added). For example, courts have observed that bartering patients' health information in exchange for access to software constitutes a prohibited sale under HIPAA. *Dinerstein v. Google, LLC*, 484 F.

28

Supp. 3d 561, 586 (N.D. Ill. 2020) (holding that disclosing patients' "PHI" in exchange for "a perpetual license to use Google's software" constituted a prohibited "sale" under HIPAA), *aff'd as modified*, 73 F.4th 502 (7th Cir. 2023).

### b. Cape Cod also committed multiple torts against Plaintiffs and other patients under Massachusetts law.

Massachusetts law also provides that the disclosure of patient health information gives rise to tort liability. For example, under Massachusetts law, all health care providers owe their patients a duty not to disclose their medical information without that patient's informed consent. Section 70E of the General Laws of Massachusetts provides that every patient of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law." MASS. GEN. LAWS. ch. 111, § 70E. Further, in *Alberts v. Devine*, the Massachusetts Supreme Court held that the physician-patient relationship creates a duty of confidentiality, and that a physician's breach of that duty gives rise to a cause of action sounding in tort. 479 N.E.2d 113, 120 (Mass. 1985).

### II. The District Court erred by ignoring Section 1320d-6 of HIPAA, which imposes heightened criminal penalties where protected health information is knowingly disclosed "for commercial advantage."

42 U.S.C. § 1320d-6 imposes criminal liability for the knowing disclosure of protected health information. Specifically, section 1320d-6(b)(3) imposes a heightened penalty where such disclosure is done for "commercial advantage."

42 U.S.C. § 1320d-6(b)(3). Plaintiffs cited this section of HIPAA to the District Court in their 12(b)(6) briefing. Appx.713; Appx.716. Yet the District Court's order nowhere discusses it. *See* Appx.1-11.

The District Court's failure to consider Section 1320d-6 was reversible error. As the District Court noted, "a party to a communication is still liable under the ECPA when a communication 'is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States….'" Appx.7. The District Court ruled, however, that Plaintiffs failed "to plausibly allege that CCHC's 'primary motivation' or 'determinative factor' in disclosing plaintiffs' personal health information through the software-tracking technology to Facebook and Google was for the purpose of committing a criminal violation or tort, *as opposed to commercial gain or convenience*." Appx.8 (emphasis added).

But Section 1320d-6 plainly establishes that the two are not "opposed": knowing disclosures done for "commercial gain" *are crimes* under the statute. Accordingly, the District Court's ruling to the contrary was reversible error.

30

**III.    The District Court further erred because it misconstrued the crime-tort exception, which does not carve out crimes or torts done with "commercial purpose."**

**a.    The crime-tort exception simply applies where the defendant's purpose was to commit a separate crime or tort with the intercepted communication.**

The District Court held that "commercial purposes or advantages are not the stuff of which a crime-tort is made." Appx.10. This was because, the Court found, Plaintiffs' complaint "fail[ed] to plausibly allege that [Cape Cod's] 'primary motivation' or 'determinative factor' in disclosing plaintiffs' personal health information through the software-tracking technology to Facebook and Google was for the purpose of committing a criminal violation or tort, as opposed to commercial gain or convenience." Appx.8.

This reading has no basis in the statute. This Court has consistently construed unambiguous statutory texts by examining its plain text. *See Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 37-39 (1st Cir. 2020) (citing *Carcieri v. Salazar*, 555 U.S. 379, 381-82 (2009)).

The statute provides that one-party consent does not apply to an interception done "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(d). Nothing in the statutory text suggests that commercially motived crimes or torts are an exception to the exception. While the exception

31

should be "construed narrowly," it is not a license to read in additional words into the statute or impose additional requirements.

While the plain text of the statute is sufficient for reversal, it bears noting that the pre-enactment legislative history supports Plaintiffs. In *Bruesewitz v. Wyeth LLC*, the Supreme Court re-iterated that pre-enactment legislative history—reflecting the intent of legislators prior to voting on a bill's final language is a legitimate tool supporting a reasonable plain text interpretation. 562 U.S. 223, 240–43 (2011). As the Second Circuit noted in *Caro v. Weintraub*:

> The legislative history of the Wiretap Act is also instructive. The Wiretap Act as initially proposed did not prohibit interception where one of the parties to the communication consented, regardless of the parties' intent. Senator Philip A. Hart objected to the broad language, observing that it permitted "surreptitious monitoring of a conversation by a party to the conversation, even though the monitoring may be for insidious purposes such as *blackmail*, *stealing business secrets*, or other criminal or tortious acts in violation of Federal or State laws."

618 F.3d 94, 99 (2d Cir. 2010) (emphasis added) (internal citation omitted). Thus, the legislative history confirms that, consistent with the plain language, the exception covers crimes or torts done with pecuniary motives.

Consistent with the foregoing, courts across the country have found that pleading a purpose to violate HIPAA triggers the crime-tort exception. *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 719-20 (D. Minn. 2023); *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 382-83 (S.D.N.Y. 2024); *Kane v. Univ.*

*of Rochester*, 2024 WL 1178340, at \*6–8 (W.D.N.Y. Mar. 19, 2024); *Gay v. Garnet Health*, 23-cv-06950 (NSR), 2024 WL 4203263, at \*3–4 (S.D.N.Y. Sept. 16, 2024); *R.S. v. Prime Healthcare Servs., Inc.*, Case No. 5:24-cv-00330-ODW (SPx), 2025 WL 103488, at \*4-5 (C.D. Cal. Jan. 13, 2025); *W.W. v. Orlando Health, Inc.*, Case No: 6:24-cv-1068-JSS-RMN, 2025 WL 722892, at \*7 (M.D. Fla. Mar. 6, 2025); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 928 n.4 (D. Minn. 2024); *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2024 WL 3455020, at \*3 (N.D. Ill. July 18, 2024); *Sweat v. Hous. Methodist Hosp.*, Civil Action No. H-24-775, 2024 WL 3070184, at \*3-4 (S.D. Tex. June 20, 2024); *Brahm v. Hosp. Sisters Health Sys.*, 23-cv-444-wmc, 2024 WL 3226135, at \*5–6 (W.D. Wis. June 28, 2024); *Lugo v. Inova Health Care Servs.*, No. 1:24-cv-700 (PTG/WEF), 2025 WL 905191, at \*6–8 (E.D. Va. Mar. 25, 2025); *Hartley v. Univ. of Chi. Med. Ctr.*, Case No. 22 C 5891, 2024 WL 1886909, at \*1–2 (N.D. Ill. Apr. 30, 2024); *A.D. v. Aspen Dental Mgmt., Inc.*, No. 24 C 1404, 2024 WL 4119153, at \*2–3 (N.D. Ill. Sept. 9, 2024); *Castillo v. Costco Wholesale Corp.*, CASE NO. 2:23-cv-01548-JHC, 2024 WL 4785136, at \*5–8 (W.D. Wash. Nov. 14, 2024); *Smith v. Loyola Univ. Med. Ctr.*, No. 23 CV 15828, 2024 WL 3338941, at \*5–7 (N.D. Ill. July 9, 2024); *Doe v. Tenet Healthcare Corp.*, No. 1:23-CV-01106-DC-CKD, 2025 WL 1635956, at \*23 (E.D. Cal. June 9, 2025).

In this instance, Plaintiffs alleged that Cape Cod intercepted their protected health information for the purpose of disclosing it to Google and Facebook in violation of HIPAA and state law. This purpose to commit crimes under HIPAA and torts under state law triggers the crime-tort exception. Under the plain statutory text, nothing more is needed.

**b.    The District Court misapplied an inapposite "primary motivation"/"determining factor" test for the crime-tort exception. Properly applied, that test still warrants reversal.**

In dismissing Plaintiffs' Wiretap Act claim, the District Court misapplied a test taken from Second and D.C. Circuit case law under which, for the exception to apply, "[t]he crime or tort must have been the [1] 'primary motivation' or [2] 'a determinative factor' for the defendant's conduct."[1] *Cooper*, 742 F. Supp. 3d at 378; *see* Appx.8 (citing *United States v. McHugh*, 57 F. Supp. 3d 95, 100 (D. Mass. 2014)).[2]

---

[1] The test is disjunctive. *See United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993).

[2] *McHugh* involved a criminal defendant who argued that certain surreptitious recordings made by a co-conspirator should be suppressed because they were made for the impermissible purpose of extortion, thereby triggering the crime-tort exception. 57 F. Supp. 3d at 99. The court held that the crime-tort exception was inapposite because, to the contrary, the evidence showed the co-conspirator made the recordings for the permissible purpose of self-protection against prosecution, rather than blackmail; there was "simply no evidence in the record that at the time CO taped his conversations with McHugh he had any intention (or reason) to blackmail McHugh or that he ever threatened to do so." *Id.* at 100. *McHugh* therefore turns on its facts—on the record before the court, the evidence suggested only that a "licit" purpose of self-preservation existed. As the *McHugh* court stated, the party seeking the crime-tort exception "must show that the 'receipt' of the illegal transaction was recorded for an *independent* impermissible purpose." *Id.* Exactly such an independent purpose—*i.e.*, the disclosure of health information in violation of HIPAA—exists here.

34

Plaintiffs submit that this is not the appropriate test for whether the crime-tort exception applies (see section IV, *infra*), but even were it the appropriate test, it would counsel reversal. The suggestion that a pecuniary motive for committing the relevant tort or crime somehow negates liability is not consistent with the test, which requires simply that the interception was done with "the purpose of facilitating some further impropriety"—*i.e.*, the purpose of committing the relevant crime or tort. *See Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). That pecuniary motives may have existed for committing the crime or tort does not make them any less a crime or tort:

> Take blackmail, which the Ninth Circuit gave as an example of an ECPA violation. … Under Prime Healthcare's reading, the ECPA would not prohibit a person from intercepting a communication with the intent to use that communication to blackmail so long as the ultimate reason for the blackmail was to make money. There, the interceptor's primary purpose would be to make money. And blackmail would merely be a means by which to make money. Of course, this is often the end goal for blackmail. *Cf. Blackmail*, BLACK'S LAW DICTIONARY (12th ed. 2024) (providing historical definition as a "tax consisting of money, cattle, crops, or other consideration" and providing as an example "threaten[ing] to expose a criminal act unless I am paid money"). Under Prime Healthcare's reading, blackmail would rarely, if ever, violate the ECPA. This cannot be the case.

*Prime Healthcare Servs., Inc.*, 2025 WL 103488, at \*7; *see also Cooper*, 742 F. Supp. 3d at 378 ("[T]he mere existence of [a] lawful purpose alone does not 'sanitize

35

a[n interception] that was also made for an illegitimate purpose.'" (quoting *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 514 (S.D.N.Y. 2001)).

"Many crimes and torts are motivated by a desire to make money, and it 'defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Kurowski*, 2024 WL 3455020, at *4–5 (quoting *Mekhail*, 726 F. Supp. 3d at 928 n.4). In the context of the ECPA and beyond, courts have held that "[t]he existence of [a] legitimate purpose [does] not sanitize the illegitimate one." *SEC v. Lipson*, 278 F.3d 656, 661 (7th Cir. 2002) (citing *Sussman*, 186 F.3d at 1202); *Castillo*, 2024 WL 4785136, at *6 (declining to adopt a "bright-line rule insulating financial motives from the crime-tort exception"). "Put simply, committing a tort and seeking a profit are not mutually exclusive (if anything, the latter is often the reason for the former)." *Riganian v. LiveRamp Holdings, Inc.*, No. 25-CV-00824-JST, 2025 WL 2021802, at *9 (N.D. Cal. July 18, 2025).

The District Court entirely failed to grapple with this line of reasoning. In so doing, the District Court erred, warranting reversal for the reasons set forth.

**IV.**　**Independently but relatedly, the District Court erred because it imposed an improper *mens rea* requirement that does not exist under the Wiretap Act.**

The Wiretap Act's crime-tort exception applies where the "communication is intercepted for the purpose of committing any criminal or

36

tortious act." 18 U.S.C. § 2511(2)(d). The District Court adopted Cape Cod's interpretation of this statutory language—finding it means that the exception only applies where a party intercepts with the intent to use the interception to harm the plaintiff. Appx.008-10. This reading of the statute contradicts its plain language, which imposes no such *mens rea* requirement.

The terms "criminal" and "tortious" modify the noun "act;" thus, under the Wiretap Act's plain terms, the relevant "purpose" must be to "commit[]" an "act" that is either criminal *or* tortious. Courts around the country have adopted this plain text reading of the crime-tort exceptions. *See, e.g.*, *Stein v. Edward-Elmhurst Health*, Case No. 23-cv-14515, 2025 WL 580556, at *5–6 (N.D. Ill. Feb. 21, 2025) (collecting cases); *see also Kurowski*, 2024 WL 3455020, at *4 (rejecting "heightened willfulness" requirement and holding that it is enough that defendant "actively chose to employ the tracking technology" knowing it would disclose patient data).

In *Stein,* the court reasoned that "[a] party does not have to say, in effect, 'I want to commit a crime' or 'today is a great day to commit a tort" in order for the crime-tort exception to the one-party consent rule to apply. 2025 WL 580556, at *5. There, patients of a health system brought an ECPA claim, alleging that the health system's enabling of web tracking tools on its web portal satisfied the crime-tort exception. *Id.* at *1–2. The court agreed, holding that a

37

plain text reading of 18 U.S.C. § 2511(2)(d) required only that the "'act' must be criminal or tortious," and not that the defendant intended to commit a crime or tort. *Id.* at *6. It concluded that the patients' Wiretap Act claim survived because the complaint alleged that the hospital disclosed PHI to a third party in violation of HIPAA, which was sufficient invoke the crime-tort exception. *Id.* As the Stein court wrote:

> A person can have a purpose of committing an act that is criminal or tortious, without having a criminal or tortious purpose. Imagine changing lanes on the highway without looking, and nailing the car in the other lane. The bad driver may have acted with the purpose of committing an act – changing lanes – that was tortious (because of the lack of ordinary care). But that's different than saying that the driver acted with a tortious purpose.
>
> The other reading would, in effect, import a *mens rea* element into the statute. … But that's not what the text says. The "act" must be criminal or tortious, but the "purpose" does not need to be criminal or tortious.

2025 WL 580556, at *6.

The reading adopted by the District Court would rewrite the statute and, further, impose a test that Congress deliberately abandoned. In 1986, Congress amended the Wiretap Act through the ECPA. Congress removed a defense for interceptions performed "for the purpose of committing any other injurious act." Pub. L. 99-508, § 191, 100 Stat. 1848, 1850 (1986). The District Court's reasoning renders Congress's conscious choice to remove the provision

ineffective by adding a culpable mental state on top of the purpose to commit an action that is criminal or tortious.

Plaintiffs' allegations satisfy the modest standard the plain language of the statute requires. Plaintiffs alleged that Cape Cod chose to deploy tracking code on its website and chose not to disclose this or obtain patient consent. Appx.639-650. Multiple courts have found substantively identical allegations sufficient. *See, e.g.*, *Stein*, 2025 WL 580556, at *6; *Kurowski*, 2024 WL 3455020, at *5–6; *Cooper*, 742 F. Supp. 3d at 380-83 (alleged purpose to disclose PHI in violation of HIPAA satisfies § 2511(2)(d)).

## V.    The District Court ignored that disclosure is an independent act separate from interception.

The District Court "emphasize[d] that it [was] unconvinced that the Complaint sufficiently alleges an independent crime or tort beyond the alleged interception itself" because Plaintiffs' allegations that Cape Cod "violated HIPAA and various torts encompass[ed] only the simultaneous interception and disclosure of information to Facebook and Google…." Appx.10 n.3. In so emphasizing, the District Court failed to acknowledge that *disclosure* to third parties is a separate and independent act from first-party *interception*.

"[A]n independent tort … arises not from the mere interception … but from the disclosure of that material to third parties," and "tortfeasors under the ECPA [should not] enjoy a bizarre defense to liability as a reward for their

efficiency." *Jarrell v. Adena Health Sys.*, Case No. 2:24-cv-00282, 2025 WL 81304, at \*2-3 (S.D. Ohio Jan. 13, 2025); *see also Gay*, 2024 WL 4203263, at \*3-4 (denying dismissal of ECPA claim because sending intercepted data to Facebook "is secondary to the interception" and satisfies exception).

*R.S. v. Prime Healthcare Services*, dismissed by the District Court as not persuasive, reaches the same conclusion: disclosure in violation of HIPAA "constitutes a 'further impropriety' independent and separate from [defendant's] interception," even though it occurs near-instantaneously. *See* 2025 WL 103488, at \*6. The District Court, like the defendant in *Prime*, "conflate[d] the crime-tort exception's 'separate and independent' component with its 'temporal' component." *Id*. "Whether the disclosure occurs simultaneously with or shortly after the interception, [Cape Cod's] purpose remained the same at the time of the interception: to disclose private information to third parties in violation of HIPAA." *Id.* In short, that the two acts of interception and disclosure occur simultaneously is irrelevant to the crime-tort analysis.

## VI.    The District Court misapplied the Rule 12(b)(6) standard.

The District Court's order dismissing Plaintiffs' claims improperly concluded that their complaint contained only conclusory assertions and ignored scores of relevant factual allegations. Appx.9 & n.2. Relatedly, the District Court improperly rejected reasonable inferences that establish that Cape

Cod's nonconsensual disclosure of PHI and PII to third parties is a distinct act proscribed by the crime-tort exception. *See id.* Finally, to stave off a motion to dismiss, Plaintiffs' complaint simply had to allege that Cape Cod's purpose was to commit an act that was criminal or tortious. It more than satisfies that requirement. The District Court erred by requiring a higher bar than that imposed by Rule 12(b)(6). This Court should reverse.

A well-pleaded complaint need only include a short and plain statement of facts entitling the plaintiff to relief. FED. R. CIV. P. 8(a); *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012). This Court has held a plaintiff survives a Rule 12(b)(6) motion where she alleges facts that suggest more than a "sheer possibility" that a defendant has acted unlawfully. *See Garcia-Catalan v. United States*, 734 F.3d 100, 102-03 (1st Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It is not required that the plaintiff show that she is likely to prevail. *Id.* She need only present enough that the "cumulative weight" of her factual allegations nudges her claim "across the line from conceivable to plausible." *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 19 (1st Cir. 2011) (citing *Iqbal*, 556 U.S. at 681).

This Court has also consistently stated that "[f]or pleading purposes, circumstantial evidence often suffices to clarify 'a protean issue such as an actor's motive or intent.'" *Rodriguez-Reyes v. Molina-Rodriguez*, 58 F.4th 517, 528

41

(1st Cir. 2023) (quoting *Anthony v. Sundlun*, 952 F.2d 603, 605 (1st Cir. 1991)). Here, a reasonable factfinder could readily infer from Cape Cod's specific choices of injecting the source code that the employs the tracking pixels that it may have consciously desired to intercept and then transmit patients' PHI and PII. *See* MODEL PENAL CODE § 2.02(a)(ii) (holding that a party acts purposely where "an element involves the attendant circumstances, [and] he is aware of the existence of such circumstances or he believes or hopes that they exist").

The District Court ignored this precedent and the extensive allegations Plaintiffs raised. Instead, the District Court limited its evaluation of the Second Amended Complaint's factual allegations to two footnotes. *See* Appx.9-10 nn.2-3. It plucked three paragraphs from the *three hundred and fourteen paragraphs* in the seventy-three page Second Amended Complaint describing the process of Cape Cod's scraping, tracking, intercepting, and disclosing private health information to third parties, and it then determined that the three selected paragraphs were the "prototypical example of … conclusory pleading" barred by *Iqbal*. Appx.9 n.2.

Additionally, the District Court invaded the province of the factfinder to make a factual determination that Cape Cod had a legitimate primary purpose to authorize the surreptitious, non-consensual tracking and disclosure of its patients' health information—to make money. Appx.10 n.3. The issue of

whether a statutory or common law purpose requirement is satisfied is not suited for disposition on a motion to dismiss. Many courts have held that "[a]pplication of the crime-tort exception appears more fit for resolution at the summary judgment or trial than at the motion to dismiss stage." *Orlando Health, Inc.*, 2025 WL 722892, at *7 (citations omitted); *see also Sartori v. Schrodt*, No. 3:18-cv-204-RV-CJK, 2018 WL 11209992, at *2 (N.D. Fla. May 22, 2018) ("In the absence of binding caselaw, it is enough to say that a 'complicated issue' which generates 'much debate' and a 'split of authority' necessarily states a plausible claim for motion to dismiss purposes.").

For instance, in *In re Group Health Plan Litigation*, the court denied a hospital's motion to dismiss its patients' Wiretap Act claim arising from its installation of the Google Pixel tool on its website. 709 F. Supp. 3d at 720. There, the patients alleged that the hospital utilized multiple tracking pixels, including the Google Analytics pixel, that surreptitiously tracked and transmitted patients' personal information and interactions on hospital websites. *Id.* at 712. The patients asserted that the activity violated HIPAA, their rights to privacy, and numerous other duties under state law. *Id.* at 712–13. Upon the hospital's motion to dismiss, the court denied it as to the Wiretap Act claim because the complaint alleged that the hospital's "primary motivation" for its "interception and disclosure was to commit wrongful and tortious acts,"

43

including a knowing violation of HIPAA and its patients' privacy rights. *Id.* at 719–20. The court further held that "[w]hile Plaintiffs have alleged [the hospital's] motivations, determination of [the hospital's] *actual* purpose for installing and using the Pixel Code *requires a factual undertaking*." *Id.* (emphasis added).

Here, the District Court improperly undertook that factual undertaking, and improperly determined that Plaintiffs' allegations were insufficient because the District Court believed Cape Cod had a "pure" motive of commercial gain. Appx.10. Just like the complaint in *Group Health*, the Second Amended Complaint here alleges that the hospital violated HIPAA through enabling the interception and subsequent disclosure of patient PHI through third-party web tracking tools. *See* 709 F. Supp. 3d at 719-20. This is more than sufficient to satisfy Rule 8(a). The district court admits its own error in applying the proper legal standard by stating it was "unconvinced that the Complaint" set out the grounds for a viable crime or tort separate from the interception itself. Appx.10 n.3.

An issue of whether a factual allegation is plausible does not require extensive analysis of whether it is true or not or whether it is "convincing" or not. This is why this Court has directed district courts to accept the plaintiff's well-pleaded facts as true. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st

Cir. 2018) (holding that non-conclusory and non-speculative facts must be accepted as true).

Likewise, the issue of whether the crimes or torts that Plaintiffs allege are independent of any Wiretap Act violation are also an issue of fact for a fact finder, with the benefit of discovery flushing out the nature and purpose of Cape Cod's actions. *In re Group Health Plan Litigation*, 709 F. Supp. 3d at 719–20. Even the authority the District Court relies on illustrates this point. In *Sussman*, the Ninth Circuit considered a district court's *summary judgment* on the plaintiffs' ECPA claims. *See* 186 F.3d at 1201–02. This underscores that dismissal is premature at this stage, without the benefit of discovery.

Finally, the District Court's weighing of Plaintiffs' allegations of alternative motives was improper. This Court should vacate and remand because "the existence of a financial motivation" supporting a conscious choice to allow the interception and disclosure of PHI "is not a get-out-of-liability free card." *See Stein*, 2025 WL 580556, at *6. At minimum, it is an ultimate fact question—not a pleadings question.

For all these reasons, this Court should reverse.

# CONCLUSION

Many crimes involve pecuniary motives. This does not mean they are not crimes. Here, HIPAA criminalizes the precise conduct at issue. That conduct also violates state tort law. Cape Cod's purpose to commit these crimes and torts suffices to trigger the crime-tort exception to one-party consent under the Wiretap Act.

As shown above, the District Court misapplied the relevant standard, misconstrued the Wiretap Act's crime-tort exception, and imposed an improper *mens rea* requirement that contradicts the Wiretap Act's plain text. This Court should reverse.

/s/ *Antonio X. Milton*
Antonio X. Milton
First Circuit Bar Number 1218904
Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
Ahmad Zavitsanos & Mensing, P.L.L.C.
1221 McKinney Street
Houston, TX 77010
amilton@azalaw.com
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL

Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
adj@kellerpostman.com

COUNSEL FOR APPELLANTS,
INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY
SITUATED

47

## CERTIFICATE OF SERVICE

I certify that on September 10, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system and that all parties or their counsel of record that are registered as ECF Filers will be served by the CM/ECF system.

*/s/ Antonio Xavier Milton*
Antonio X. Milton

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 1st CIR. R. 32.1: this document contains 7,977 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 1st CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt Calisto MT.

*/s/ Antonio Xavier Milton*
Antonio X. Milton

# ADDENDUM

**Pages(s)**

Dkt No. 33, Order Granting Motion to Dismiss for Failure to State a
Claim (Appx1) ................................................................................................ 1

42 U.S.C. § 1320d-6 ......................................................................................12

18 U.S.C. § 2511 ...........................................................................................14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 25-10445-RGS

DEBRA GOULART AND MICHAEL GARBITT,
Individually and on behalf of all others similarly situated

v.

CAPE COD HEALTHCARE, INC.

MEMORANDUM AND ORDER ON MOTION TO DISMISS

June 24, 2025

STEARNS, D.J.

In this putative class action, plaintiffs Debra Goulart and Michael Garbitt claim that defendant Cape Cod Healthcare, Inc. (CCHC), through internet-tracking technologies, unlawfully disclosed their private health-related information and personally identifiable information to Facebook and Google, in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 (ECPA). Before the court is CCHC's motion to dismiss the ECPA claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the court will allow the motion.

## BACKGROUND

Goulart and Garbitt allege the following facts in their Second Amended Complaint (SAC). *See* Dkt. # 30 (SAC). For the purposes of the present

motion, the court accepts the facts as true.  CCHC is a not-for-profit, healthcare system that provides medical services for residents and visitors of Cape Cod.[1]  SAC ¶ 6.  It also owns and operates capecodhealth.org, a public website featuring an online patient portal, which is password protected.  *Id.* ¶¶ 19, 26, 29, 158.  Visitors with log-in credentials may search the website for physicians, research services and treatment options, and pay medical bills.  *Id.* ¶ 22.  Users of CCHC's patient portal may also make appointments, access medical records, view lab results, and exchange communications with healthcare providers.  *Id.* ¶ 23.

The CCHC website and patient portal embed digital marketing trackers created by Facebook (which is owned by Meta) and Google.  *Id.* ¶¶ 35, 42, 45, 49.  These "tracking pixels" collect dozens of data points about individual website users who interact with the site and that are then shared with third parties.  *Id.* ¶ 43.  Specifically, CCHC deploys on its website and patient portal Meta Pixel, one of the world's most ubiquitous tracking pixels.  *Id.* ¶¶ 44, 45, 49.  Meta Pixel allows CCHC and Facebook "to secretly track, intercept,

---

[1] CCHC operates a number of facilities on Cape Cod, including hospitals such as Cape Cod Hospital, Falmouth Hospital, JML Health Care Center, Cape Cod Surgery Center, Davenport-Mugar Cancer Center, Falmouth Hospital Rehabilitation Center, Cape Cod Healthcare Urgent Care-Falmouth, Cape Cod Healthcare Urgent-Care Harwich, and Cape Cod Healthcare Pharmacy.

record, and transmit every patient communication made on Defendant's websites." *Id.* ¶ 45. For example, when plaintiffs accessed CCHC's website, Meta Pixel software directed the patients' browsers to send private information, such as "the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing" to third-party advertising companies, like Facebook. *Id.* ¶ 27. The installation of the tracking codes on CCHC's patient portal "resulted in disclosures of patients' personal health information, including their patient status, whenever [patients] logged into the patient portal for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors." *Id.* ¶ 49. The transmission of information to Facebook is "instantaneous" and done without the user's knowledge – Facebook often receives the information before the healthcare provider. *Id.* ¶¶ 104, 110. In exchange for installing Meta Pixel on its websites, CCHC receives from Facebook "analytics about the ads they have placed on Facebook and Instagram and tools to target people who have visited their website." *Id.* ¶ 112. Facebook uses the disclosed information to track user data and communications for marketing purposes. *Id.* ¶ 41.

In addition to Meta Pixel, CCHC also uses Google Analytics and Google Tag Manager on its website and patient portal to "track[] and disclose[]

patient activity, IP addresses, cookies, geolocation, and other unique device identifiers" to Google. *Id.* ¶¶ 50-54, 158. Like Facebook, Google uses the disclosed information to track user data and communications for marketing purposes. *Id.* ¶ 41.

Goulart and Garbitt have been treated by CCHC's physicians. *Id.* ¶¶ 7-11. Goulart used CCHC's website to locate providers, schedule appointments, pay for medical services, and research treatments related to knee replacement recovery as well as cancer screening procedures. *Id.* ¶ 11. She used the patient portal to check lab results for biopsies and bone density tests. *Id.* After using CCHC's website and patient portal, she began receiving "online advertisements related to her research, including knee replacement-related pain." *Id.* Garbitt used CCHC's website to research the credentials of his primary care physician and cardiologist. *Id.* ¶ 12. He used the patient portal to follow up on treatment he received from CCHC and to learn the results of tests that he had undergone at Cape Cod Hospital regarding his heart condition. *Id.* Goulart and Garbitt believed that their interactions with CCHC's website were privileged and would not be shared with anyone other than their healthcare providers and medical staff. *Id.* ¶ 13. They did not consent to CCHC sharing their information with Facebook or Google. *Id.*

4

On December 8, 2022, the original plaintiff filed this putative class action under the pseudonym Jane Doe in the Barnstable Superior Court against CCHC. *See* Dkt. # 1, Ex. 4 at 1-2. The original Complaint set out six counts: violation of the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99; violation of the Massachusetts Right to Privacy Law, Mass. Gen. Laws ch. 214, § 1B; and common law breach of fiduciary duty and/or duty of confidentiality, breach of express contract, breach of implied contract, and unjust enrichment. *See id.* at 40-59. On January 12, 2023, CCHC removed the case from the Barnstable Superior Court to the United States District Court for the District of Massachusetts. *See* Dkt. # 1 at 2. On January 25, 2023, the District Court remanded the case to the Barnstable Superior Court. *See* Dkt. # 1 at 2. Following remand, the case was transferred to the Business Litigation Session of the Suffolk County Superior Court. *See id.* On January 31, 2025, Jane Doe amended the Complaint to include a claim under the ECPA and withdrew the Massachusetts Wiretap Act claim. *See id.* at 3. On February 24, 2025, CCHC removed the case from the Suffolk County Superior Court to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. §§ 1331, 1441(a), 1446, and 1367. *See id.* at 1.

5

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two basic principles guide the court's analysis. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. If the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," the complaint will be dismissed. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

## DISCUSSION

The ECPA provides a private right of action against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept wire, oral, or electronic communication." *In re Pharmatrak, Inc.,* 329 F.3d 9, 19 (1st Cir. 2003),

6

quoting 18 U.S.C. § 2511(1)(a).  However, there are exceptions to liability – consent and the one-party exception, which applies when the person intercepting the communication is also a "party to the communication."  18 U.S.C. § 2511(2)(d); *see In re Pharmatrak, Inc.*, 329 F.3d at 18.  The one-party exception has its own carve-out – the crime-tort exception.  *See* 18 U.S.C. § 2511(2)(d).  Under this exception, a party to a communication is still liable under the ECPA when a communication "is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."  18 U.S.C. § 2511(2)(d).

The crime-tort exception requires a plaintiff to "plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording or interception itself."  *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145 (3d Cir. 2015) (emphasis in original), quoting *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010).  Specifically, "either the 'primary motivation' or a 'determinative factor' in the actor's decision to record [is] the intent to commit a criminal or tortious act."  *United States v. McHugh*, 57 F. Supp. 3d 95, 99-100 (D. Mass. 2014); *see Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (holding that "where the taping is legal, but is done for the purpose of

7

facilitating some further impropriety, such as blackmail, [the crime-tort exception] applies. Where the purpose is not illegal or tortious, but the means are, the victims must seek redress elsewhere.").

The parties dispute the applicability of the crime-tort exception. *See* Dkt. # 12 at 9; Dkt. # 20 at 8. CCHC argues that the crime-tort exception does not apply because plaintiffs do not plausibly allege that CCHC intended to commit a crime or tort at the time of the interception. *See* Dkt. # 12 at 5. Goulart and Garbitt contend that the Complaint plausibly alleges that CCHC intended to disclose their protected health information to third parties and that disclosure of such information is ipso facto criminal and tortious. *See* Dkt. # 20 at 8.

The Complaint fails for a basic reason. It fails to plausibly allege that CCHC's "primary motivation" or "determinative factor" in disclosing plaintiffs' personal health information through the software-tracking technology to Facebook and Google was for the purpose of committing a criminal violation or tort, as opposed to commercial gain or convenience. The *Twombly-Iqbal* standard requires more than mere conclusory allegations. Rather, it puts the burden on plaintiffs to assert factual allegations that give plausible heft to their claims of personal injury. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216

(4th ed. May 2025 update); *Iqbal*, 556 U.S. at 678-679. Here, plaintiffs have failed to plead with any plausibility that the crime-tort exception applies. *See, e.g., Williams v. TMC Health*, 2024 WL 4364150, at *4 (D. Ariz. Sept. 30, 2024) (finding that the use of tracking technologies to obtain personal data, increase profits through sophisticated and targeted advertising, and to improve website analytics point to a non-criminal, non-tortious purpose); *Doe v. Genesis Health Sys.*, 2025 WL 1000192, at *9 (C.D. Ill. March 18, 2025) (dismissing ECPA claim because, by plaintiff's own account, the trackers were used by defendant to benefit its marketing and advertising purposes, not for the purpose of knowingly committing a violation of the Health Insurance Portability and Accountability Act (HIPAA)).[2]

Because there are no factual allegations in the Complaint from which the court could conclude that CCHC, a non-profit hospital system, installed Meta Pixel and software-tracking technology with the "primary motivation"

---

[2] Plaintiffs aver in the Complaint that CCHC "accessed, obtained, and disclosed plaintiffs' Personal Health Information" to Facebook and Google "for the purpose of committing the crimes and torts described herein [criminal violation of HIPAA, invasion of privacy, Mass. Gen. Laws ch. 214, § B; breach of confidentiality of medical records, Mass. Gen. Laws ch. 111, § 70E; and breach of the common law duty of confidentiality] because it would not have been able to obtain the information or the marketing services if it had complied with the law." SAC ¶¶ 235, 238-239. This is a prototypical example of the type of conclusory pleading the *Twombly-Iqbal* standard rejects. *See Tambone*, 597 F.3d at 442.

of knowingly committing a violation of HIPAA or perpetrating a tort, the Complaint fails. There are facts alleged by plaintiffs supporting the proposition that CCHC used the trackers for purposes of marketing and advertising. For example, the Complaint states that: CCHC used Meta Pixel and Google's software tools to knowingly disclose information that allows Facebook, Google, and other advertisers to target patients with ads, *see* SAC ¶ 159; CCHC "made the decision to barter its patients' PII/PHI to Facebook because it wanted access to the Meta Pixel tool," *see* SAC ¶ 162; and in exchange for disclosing PII about its patients, CCHC had been "compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions," *see* SAC ¶ 197. But as previously explained, commercial purposes or advantages are not the stuff of which a crime-tort is made.[3]

---

[3] The court emphasizes that it is unconvinced that the Complaint sufficiently alleges an independent crime or tort beyond the alleged interception itself. Plaintiffs rely on an out-of-district court case for the proposition that a violation of HIPAA constitutes a "further impropriety" independent and separate from the healthcare company's interception, and thus satisfies the crime-tort exception. *See* Dkt. # 20 at 14-15, citing *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at *6 (C.D. Cal. Jan. 13, 2025). However, such a violation does not constitute an act "secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits." *Caro*, 618 F.3d at 98. Plaintiffs' allegations that CCHC violated HIPAA and various torts encompass only the simultaneous interception and disclosure of information to Facebook and Google – no data was alleged to have been independently used in a crime or tort committed by

10

**ORDER**

For the foregoing reasons, CCHC's motion to dismiss the ECPA claim is <u>ALLOWED</u>.   Consistent with the guidance of the First Circuit, the court will decline supplemental jurisdiction over the remaining state claims and direct the Clerk to remand these claims to the Suffolk County Superior Court. *See Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998) ("[T]he balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation.").

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

CCHC. *See Okash v. Essentia Health*, 2025 WL 642913, at *3 (D. Minn. Feb. 27, 2025).

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 7. Social Security (Refs & Annos)
      Subchapter XI. General Provisions, Peer Review, and Administrative Simplification (Refs & Annos)
        Part C. Administrative Simplification

42 U.S.C.A. § 1320d-6

§ 1320d-6. Wrongful disclosure of individually identifiable health information

Currentness

**(a) Offense**

A person who knowingly and in violation of this part--

**(1)** uses or causes to be used a unique health identifier;

**(2)** obtains individually identifiable health information relating to an individual; or

**(3)** discloses individually identifiable health information to another person,

shall be punished as provided in subsection (b). For purposes of the previous sentence, a person (including an employee or other individual) shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity (as defined in the HIPAA privacy regulation described in section 1320d-9(b)(3) of this title) and the individual obtained or disclosed such information without authorization.

**(b) Penalties**

A person described in subsection (a) shall--

**(1)** be fined not more than $50,000, imprisoned not more than 1 year, or both;

**(2)** if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and

**(3)** if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

**CREDIT(S)**

(Aug. 14, 1935, c. 531, Title XI, § 1177, as added Pub.L. 104-191, Title II, § 262(a), Aug. 21, 1996, 110 Stat. 2029; amended Pub.L. 111-5, Div. A, Title XIII, § 13409, Feb. 17, 2009, 123 Stat. 271.)

Notes of Decisions (40)

42 U.S.C.A. § 1320d-6, 42 USCA § 1320d-6
Current through P.L. 119-34. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Unconstitutional or Preempted  Prior Version Held Unconstitutional as Applied by  Hutton v. Woodall,  D.Colo.,  Oct. 03, 2014

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 119. Wire and Electronic Communications Interception and Interception of Oral Communications (Refs & Annos)

18 U.S.C.A. § 2511

§ 2511. Interception and disclosure of wire, oral, or electronic communications prohibited

Currentness

**(1)** Except as otherwise specifically provided in this chapter any person who--

**(a)** intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

**(b)** intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when--

**(i)** such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

**(ii)** such device transmits communications by radio, or interferes with the transmission of such communication; or

**(iii)** such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

**(iv)** such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or

**(v)** such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;

**(c)** intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

**(d)** intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

**(e)(i)** intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(a)(ii), 2511(2)(b)-(c), 2511(2)(e), 2516, and 2518 of this chapter, (ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation,

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

**(2)(a)(i)** It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

**(ii)** Notwithstanding any other law, providers of wire or electronic communication service, their officers, employees, and agents, landlords, custodians, or other persons, are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral, or electronic communications or to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, if such provider, its officers, employees, or agents, landlord, custodian, or other specified person, has been provided with--

**(A)** a court order directing such assistance or a court order pursuant to section 704 of the Foreign Intelligence Surveillance Act of 1978 signed by the authorizing judge, or

**(B)** a certification in writing by a person specified in section 2518(7) of this title or the Attorney General of the United States that no warrant or court order is required by law, that all statutory requirements have been met, and that the specified assistance is required,

setting forth the period of time during which the provision of the information, facilities, or technical assistance is authorized and specifying the information, facilities, or technical assistance required. No provider of wire or electronic communication service, officer, employee, or agent thereof, or landlord, custodian, or other specified person shall disclose the existence of any interception or surveillance or the device used to accomplish the interception or surveillance with respect to which the person has been furnished a court order or certification under this chapter, except as may otherwise be required by legal process and then only after prior notification to the Attorney General or to the principal prosecuting attorney of a State or any political subdivision of a State, as may be appropriate. Any such disclosure, shall render such person liable for the civil damages provided

for in section 2520. No cause of action shall lie in any court against any provider of wire or electronic communication service, its officers, employees, or agents, landlord, custodian, or other specified person for providing information, facilities, or assistance in accordance with the terms of a court order, statutory authorization, or certification under this chapter.

**(iii)** If a certification under subparagraph (ii)(B) for assistance to obtain foreign intelligence information is based on statutory authority, the certification shall identify the specific statutory provision and shall certify that the statutory requirements have been met.

**(b)** It shall not be unlawful under this chapter for an officer, employee, or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of chapter 5 of title 47 of the United States Code, to intercept a wire or electronic communication, or oral communication transmitted by radio, or to disclose or use the information thereby obtained.

**(c)** It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

**(d)** It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

**(e)** Notwithstanding any other provision of this title or section 705 or 706 of the Communications Act of 1934, it shall not be unlawful for an officer, employee, or agent of the United States in the normal course of his official duty to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, as authorized by that Act.

**(f)** Nothing contained in this chapter or chapter 121 or 206 of this title, or section 705 of the Communications Act of 1934, shall be deemed to affect the acquisition by the United States Government of foreign intelligence information from international or foreign communications, or foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system, utilizing a means other than electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, and procedures in this chapter or chapter 121 and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted.

**(g)** It shall not be unlawful under this chapter or chapter 121 of this title for any person--

**(i)** to intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public;

**(ii)** to intercept any radio communication which is transmitted--

**(I)** by any station for the use of the general public, or that relates to ships, aircraft, vehicles, or persons in distress;

**(II)** by any governmental, law enforcement, civil defense, private land mobile, or public safety communications system, including police and fire, readily accessible to the general public;

**(III)** by a station operating on an authorized frequency within the bands allocated to the amateur, citizens band, or general mobile radio services; or

**(IV)** by any marine or aeronautical communications system;

**(iii)** to engage in any conduct which--

**(I)** is prohibited by section 633 of the Communications Act of 1934; or

**(II)** is excepted from the application of section 705(a) of the Communications Act of 1934 by section 705(b) of that Act;

**(iv)** to intercept any wire or electronic communication the transmission of which is causing harmful interference to any lawfully operating station or consumer electronic equipment, to the extent necessary to identify the source of such interference; or

**(v)** for other users of the same frequency to intercept any radio communication made through a system that utilizes frequencies monitored by individuals engaged in the provision or the use of such system, if such communication is not scrambled or encrypted.

**(h)** It shall not be unlawful under this chapter--

**(i)** to use a pen register or a trap and trace device (as those terms are defined for the purposes of chapter 206 (relating to pen registers and trap and trace devices) of this title); or

**(ii)** for a provider of electronic communication service to record the fact that a wire or electronic communication was initiated or completed in order to protect such provider, another provider furnishing service toward the completion of the wire or electronic communication, or a user of that service, from fraudulent, unlawful or abusive use of such service.

**(i)** It shall not be unlawful under this chapter for a person acting under color of law to intercept the wire or electronic communications of a computer trespasser transmitted to, through, or from the protected computer, if--

**(I)** the owner or operator of the protected computer authorizes the interception of the computer trespasser's communications on the protected computer;

**(II)** the person acting under color of law is lawfully engaged in an investigation;

**(III)** the person acting under color of law has reasonable grounds to believe that the contents of the computer trespasser's communications will be relevant to the investigation; and

**(IV)** such interception does not acquire communications other than those transmitted to or from the computer trespasser.

**(j)** It shall not be unlawful under this chapter for a provider of electronic communication service to the public or remote computing service to intercept or disclose the contents of a wire or electronic communication in response to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies section 2523.

**(3)(a)** Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

**(b)** A person or entity providing electronic communication service to the public may divulge the contents of any such communication--

**(i)** as otherwise authorized in section 2511(2)(a) or 2517 of this title;

**(ii)** with the lawful consent of the originator or any addressee or intended recipient of such communication;

**(iii)** to a person employed or authorized, or whose facilities are used, to forward such communication to its destination; or

**(iv)** which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

**(4)(a)** Except as provided in paragraph (b) of this subsection or in subsection (5), whoever violates subsection (1) of this section shall be fined under this title or imprisoned not more than five years, or both.

**(b)** Conduct otherwise an offense under this subsection that consists of or relates to the interception of a satellite transmission that is not encrypted or scrambled and that is transmitted--

**(i)** to a broadcasting station for purposes of retransmission to the general public; or

**(ii)** as an audio subcarrier intended for redistribution to facilities open to the public, but not including data transmissions or telephone calls,

is not an offense under this subsection unless the conduct is for the purposes of direct or indirect commercial advantage or private financial gain.

[**(c)** Redesignated (b)]

**(5)(a)(i)** If the communication is--

**(A)** a private satellite video communication that is not scrambled or encrypted and the conduct in violation of this chapter is the private viewing of that communication and is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain; or

**(B)** a radio communication that is transmitted on frequencies allocated under subpart D of part 74 of the rules of the Federal Communications Commission that is not scrambled or encrypted and the conduct in violation of this chapter is not for a tortious or illegal purpose or for purposes of direct or indirect commercial advantage or private commercial gain,

then the person who engages in such conduct shall be subject to suit by the Federal Government in a court of competent jurisdiction.

**(ii)** In an action under this subsection--

**(A)** if the violation of this chapter is a first offense for the person under paragraph (a) of subsection (4) and such person has not been found liable in a civil action under section 2520 of this title, the Federal Government shall be entitled to appropriate injunctive relief; and

**(B)** if the violation of this chapter is a second or subsequent offense under paragraph (a) of subsection (4) or such person has been found liable in any prior civil action under section 2520, the person shall be subject to a mandatory $500 civil fine.

**(b)** The court may use any means within its authority to enforce an injunction issued under paragraph (ii)(A), and shall impose a civil fine of not less than $500 for each violation of such an injunction.

### CREDIT(S)

(Added Pub.L. 90-351, Title III, § 802, June 19, 1968, 82 Stat. 213; amended Pub.L. 91-358, Title II, § 211(a), July 29, 1970, 84 Stat. 654; Pub.L. 95-511, Title II, § 201(a) to (c), Oct. 25, 1978, 92 Stat. 1796, 1797; Pub.L. 98-549, § 6(b)(2), Oct. 30, 1984, 98 Stat. 2804; Pub.L. 99-508, Title I, §§ 101(b), (c)(1), (5), (6), (d), (f)[1], 102, Oct. 21, 1986, 100 Stat. 1849 to 1853; Pub.L. 103-322, Title XXXII, § 320901, Title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2123, 2147; Pub.L. 103-414, Title II, §§ 202(b), 204, 205, Oct. 25, 1994, 108 Stat. 4290, 4291; Pub.L. 104-294, Title VI, § 604(b)(42), Oct. 11, 1996, 110 Stat. 3509; Pub.L. 107-56, Title II, §§ 204, 217(2), Oct. 26, 2001, 115 Stat. 281, 291; Pub.L. 107-296, Title XXII, § 2207(h)(2), (j)(1), formerly Title II, § 225(h)(2), (j)(1), Nov. 25, 2002, 116 Stat. 2158; renumbered § 2207(h)(2), (j)(1), Pub.L. 115-278, § 2(g)(2)(I), Nov. 16, 2018, 132 Stat. 4178; amended Pub.L. 110-261, Title I, §§ 101(c)(1), 102(c)(1), July 10, 2008, 122 Stat. 2459; Pub.L. 115-141, Div. V, § 104(1)(A), Mar. 23, 2018, 132 Stat. 1216.)

**AMENDMENT OF PARAGRAPH (2)(A)(II)(A)**

<Pub.L. 110-261, Title IV, § 403(b)(2), July 10, 2008, 122 Stat. 2474, as amended, provided that effective two years after April 20, 2024, except as provided in section Pub.L. 110-261, § 404, as amended, set out as a Transition Procedures note under 50 U.S.C.A. § 1801, par. (2)(a)(ii)(A) is amended by striking "or a court order pursuant to section 704 of the Foreign Intelligence Surveillance Act of 1978" after "assistance".>

**VALIDITY**

<For constitutionality of certain provisions of this section as amended by Pub.L. 99-508, Title I, § 101(c)(1)(A), see Bartnicki v. Vopper, U.S.Pa.2001, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787>

Notes of Decisions (538)

**O'CONNOR'S COMMENTS**

**United States Sentencing Guidelines**
§2B5.3 (basic economic offenses)

§2H3.1 (offenses involving individual rights)

18 U.S.C.A. § 2511, 18 USCA § 2511
Current through P.L. 119-34. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.