No. 25-1672

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

DEBRA GOULART, individually and on behalf of all others similarly situated; MICHAEL GARBITT, individually and on behalf of all others similarly situated,

Plaintiffs – Appellants,

JANE DOE; JOHN DOE; JANET DOE,

Plaintiffs,

v.

CAPE COD HEALTHCARE, INC.,

Defendant – Appellee.

On Appeal from
United States Court for the District of Massachusetts
No.: 25-cv-10445-RGS

## REPLY BRIEF OF APPELLANTS

Antonio Xavier Milton
Ahmad Zavitsanos & Mensing, P.L.L.C.
1221 McKinney Street
Houston, TX 77010
713-655-1101

# TABLE OF CONTENTS

**Contents**          **Pages(s)**

TABLE OF CONTENTS ..................................................................................2

TABLE OF AUTHORITIES ..........................................................................3

INTRODUCTION ..........................................................................................6

POINTS IN REPLY ..................................................................................... 12

    I.     Plaintiffs adequately alleged that Cape Cod intercepted their communications for "the purpose of committing [a] criminal or tortious act." ................................................................................ 12

       A.  Plaintiffs' interpretation of the crime-tort exception's purpose requirement is consistent with—and in fact, called for by—the Supreme Court's precedent. ................................................................ 13

       B.  Plaintiffs' interpretation of the purpose requirement is consistent with this Court's and other courts of appeals' precedent. ............................... 19

    II.    Plaintiffs' interpretation of the purpose requirement is consistent with the plain language of ECPA, grammatical, and honors legislative history. . 23

       A.  Plaintiffs' interpretation renders no words superfluous. .................... 23

       B.  Plaintiffs' interpretation is grammatical. .......................................... 24

       C.  Appellee misstates Plaintiffs' position on legislative history .............. 26

       D.  Appellee's absurdity and rule of lenity arguments lack merit. ........... 27

    III.   Plaintiffs alleged an intended crime and tort separate from the interception. ................................................................................ 30

CONCLUSION............................................................................................. 34

CERTIFICATE OF SERVICE ................................................................... 36

CERTIFICATE OF COMPLIANCE ......................................................... 36

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Alberts v. Devine*,
395 Mass. 59 (1985) .................................................................. 28

*Borden v. United States*,
593 U.S. 420 (2021) ..............................................................14, 17

*Boudreau v. Lussier*,
901 F.3d 65 (1st Cir. 2018) ...................................................... 33

*Bryan v. United States*,
524 U.S. 184 (1998) ..............................................................15, 16

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010).....................................................20, 26

*Castaneda v. Souza*,
810 F.3d 15 (1st Cir. 2015) ...................................................... 24

*Cheek v. United States*,
498 U.S. 192 (1991) .................................................................. 14

*Desnick v. Am. Broad. Companies, Inc.*,
44 F.3d 1345 (7th Cir. 1995)..................................................20, 21

*Doe v. Lawrence Gen. Hosp.*,
No. 25-CV-10081-NMG, 2025 WL 2808055 (D. Mass. Aug. 29, 2025),
report and recommendation adopted in part, rejected in part, No. CV 25-
10081-NMG, 2025 WL 2807673 (D. Mass. Sept. 30, 2025)...................... 10

*Elonis v. United States*,
575 U.S. 723 (2015) .................................................................. 23

*Kurowski v. Rush Sys. for Health*,
No. 22 C 5380, 2024 WL 3455020 (N.D. Ill. July 18, 2024) .............. passim

*Littlefield v. Mashpee Wampanoag Indian Tribe,*
    951 F.3d 30 (1st Cir. 2020) ....................................................... 27

*MacDonald v. Clinger,*
    84 A.D.2d 482 (N.Y. 1982) ...................................................... 28

*McManus v. Tufts Med. Ctr., Inc.,*
    No. 25-CV-10008-ADB, 2025 WL 2778025 (D. Mass. Sept. 29, 2025)....... 10

*Mekhail v. N. Mem'l Health Care,*
    No. 23 C 00440, 2024 WL 1332260 (D. Minn. Mar. 28, 2024).................. 22

*O'Connor v. Oakhurst Dairy,*
    851 F.3d 69 (2017) .................................................................. 24

*Ratzlaf v. United States,*
    510 U.S. 135 (1994) ................................................................ 15

*Reno v. Koray,*
    515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) ................................. 30

*Ruiz v. Bally Total Fitness Holding Corp.,*
    496 F.3d 1 (1st Cir. 2007) .......................................................14, 20

*Staples v. United States,*
    511 U.S. 600 (1994) ................................................................ 24

*Stein v. Edward-Elmhurst Health,*
    No. 23-CV-14515, 2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ........ 17, 25, 26

*United States v. Bailey,*
    444 U.S. 394 (1980) ................................................................ 14

*United States v. Cassiere,*
    4 F.3d 1006 (1st Cir. 1993) ......................................................... 20

*United States v. Councilman,*
    418 F.3d 67 (1st Cir. 2005) ......................................................... 30

*United States v. Krause,*
    914 F.3d 1122 (8th Cir. 2019) ....................................................... 25

*United States v. Toth*,
33 F.4th 1 (1st Cir. 2022) .......................................................................... 30

*United States v. Vest*,
639 F. Supp. 899 (D. Mass. 1986) ......................................................20, 21

*United States v. Vest*,
639 F. Supp. 899 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987) ........ 20

*Vita v. Blue Cross and Blue Shield of Massachusetts, Inc.*,
No. 1:25-cv-10420-LTS (D. Mass. Oct. 17, 2025) ...................................... 10

**Statutes**

18 U.S.C. § 2510(4) ................................................................................. 32

18 U.S.C. § 2511(2)(d) ................................................................ 6, 13, 23, 26

18 U.S.C. § 2511(a),(c) ............................................................................ 32

42 U.S.C. § 1320d-6 ................................................................................ 28

42 U.S.C. § 1320d-6(a)(3) ........................................................................ 17

42 U.S.C. § 1320d-6(b)(3) ........................................................................ 29

MASS. GEN. LAWS ch. 111, § 70E ............................................................. 28

**Regulations**

105 MASS. CODE REGS. 300.120 ................................................................ 28

45 C.F.R § 160.404(b)(2)(i) ...................................................................... 13

45 C.F.R. § 160.103 ................................................................................. 29

45 C.F.R. § 164.102 ................................................................................. 28

**Legislative Materials**

S. REP. NO. 90–1097, 1968 U.S.C.C.A.N. 2112 (1968) .............................. 26

## INTRODUCTION

This appeal from the District Court's ruling dismissing Plaintiffs' Electronic Communications Privacy Act ("ECPA") claim turns on whether Plaintiffs' allegations bring their claim within the ECPA's crime-tort exception to one-party consent. It turns, therefore, on whether Plaintiffs alleged facts sufficient for a reasonable factfinder to find that Appellee had the "purpose of committing [a] criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Appellee has contended, and the District Court agreed, that because it installed the tracking technologies at issue "for purposes of marketing and advertising" rather than "with the 'primary motivation' of knowingly committing a violation of HIPAA or perpetrating a tort, the Complaint fails." Appx.9-10. In short, the District Court found, "commercial purposes or advantages are not the stuff of which a crime-tort is made." Appx.10.

The District Court erred in its construction of the ECPA, as discussed in Plaintiffs' Opening Brief and below. The District Court further erred—and Appellee likewise errs in its briefing here—even under the test it purported to apply because Plaintiffs' pleadings contain ample allegations that would permit a reasonable factfinder to infer that Appellee "knowingly commit[ed] a violation of HIPAA," Appx.9. These include, among others, Plaintiffs' allegations that:

- Appellee could and did select which pages on its web properties would have tracking technology deployed, and chose to do so on pages that were likely to contain PHI. Appx.768-772 (alleging pages on Appellee's website on which it chose to deploy tracking technology, including physician search, appointment-making, bill payment, and treatment request form pages).

- "Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' PII/PHI, including sensitive medical information and personally identifiable data." Appx.778.

- Regarding the Google Analytics software that Appellee installed on its web properties, "Google warns web developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that 'Health' is a prohibited category that should be used by advertisers to target ads to users or promote advertisers' products or services." Appx.776-777. But Appellee nevertheless placed Google Analytics on every page of its website. Appx.777.

- Appellee's own privacy policies expressly promise that Appellee will protect the privacy and personal information of users of its site, and that

it does not collect any "personally identifiable information" from users. Appx.800. Contrary to those promises, Appellee routinely and knowingly shared patients' PHI with Facebook and Google for years. Appx.745.

- Appellee intentionally concealed its use of tracking technologies from the public, which a reasonable factfinder could conclude was evidence that Appellee knew what it was doing was illegal. Appx.786-787.

- "Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein." Appx.795. Those criminal and tortious acts are described at length. *E.g.*, Appx.745-752.

The legal significance of these allegations and others relevant to specific aspects of Plaintiffs' argument is discussed in detail below.

Rather than explain why Appellants' pleadings fall short, Appellee attempts to rewrite them. First, Appellee downplays Appellants' allegations of tracking inside of Appellees' patient portal as "cursory" and limited to "four of 320 paragraphs." *See* Resp. Br. at 9, n.3. In fact, Appellants describe in detail: (1) how Appellee offers a patient portal to their patients, Appx.618; Appx.628, (2) Appellee's use of tracking technologies including Google Analytics inside of its patient portal, Appx.623; Appx.624; Appx.649, and (3) the ways each Appellant used that patient portal to communicate with their treating

physicians. Appx.615-617. By minimizing these detailed allegations, Appellee invites this Court to erroneously discount Appellants' allegations—just as the District Court did.

Second, Appellee misstates that AdTech "operates via a single transmission from Plaintiffs' web browsers to third parties, thereby simultaneously intercepting and disclosing Plaintiffs' data." *See* Resp. Br. at 10. As explained *infra*, section II, Plaintiffs instead pleaded that tracking technologies work through a multi-step process where the interception and disclosure occur separately. Appx.623; Appx.632; Appx.634; Appx.636; Appx.640.

Third, Appellee inaccurately claims that Plaintiffs "do not allege … that CCHC acted for any criminal or tortious purpose." *See* Resp. Br. at 10. As discussed below, *infra* section I, Appellee's interpretation misconstrues the clear language of the statute and attempts to rewrite or simply ignore Plaintiffs' well-pled allegations.

In light of Plaintiffs' *actual* pleadings, none of the recent trial court decisions that Appellee cites support its arguments. Rather, each turned on specific deficiencies that are not present here:

- In *Vita v. Blue Cross and Blue Shield of Massachusetts, Inc.*, the plaintiff chose not to plead any details regarding her use of the challenged website for privacy reasons. No. 1:25-cv-10420-LTS, slip op. at 4-7 (D. Mass. Oct. 17, 2025). The court dismissed the complaint *solely* for that reason and gave the plaintiff leave to amend and file under seal to address those concerns. Neither Appellees nor the District Court raised similar challenges to Plaintiffs' pleadings here.

- In *McManus v. Tufts Med. Ctr., Inc.*, the trial court dismissed in large part because the plaintiffs failed to allege that the defendant was on notice of how information would be tracked and shared with Facebook, Google, and other third parties. No. 25-CV-10008-ADB, 2025 WL 2778025, at *3 (D. Mass. Sept. 29, 2025). Here, in contrast, Plaintiffs' complaint is replete with allegations that Defendants knew exactly how the information they intercepted would be disclosed to and used by third parties. *See, e.g.,* Appx.647; Appx.649; Appx.650.

- Lastly, in *Doe v. Lawrence General Hosp.* (*LGH*), the court dismissed the plaintiffs' ECPA claim because there was no "allegation that [defendant] ever entertained a conscious purpose of disclosing the identities of its patients, or their treatments, to Google or Meta." *Doe v. Lawrence Gen. Hosp.*, No. 25-CV-10081-NMG, 2025 WL 2808055, at *31 (D. Mass. Aug. 29, 2025), report and recommendation adopted in part, rejected in part, No. CV 25-10081-NMG, 2025 WL 2807673 (D. Mass. Sept. 30, 2025). That missing allegation is present here: "Defendant intentionally shares the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool." Appx.647; Appx.649. Moreover, when discussing the plausibility of the allegations of a criminal or tortious purpose, the *LGH* court repeatedly distinguished between cases like *LGH* where there was no allegation of tracking inside of the defendant's patient portal and cases—like this one—where such allegations are present. *Compare* 2025 WL 2808055 at *32–34, *with* Appx.624; Appx.649.

Thus, the District Court's decision remains an outlier within the First Circuit: the only decision granting a motion to dismiss when faced with allegations that a defendant knowingly and intentionally disclosed intercepted communications to third parties in violation of HIPAA. As shown in Plaintiffs' Opening Brief and below, this Court should reverse.

I. **Plaintiffs adequately alleged that Cape Cod intercepted their communications for "the purpose of committing [a] criminal or tortious act."**

For all Appellee's claims that Plaintiffs set up strawman arguments in their Opening Brief, it is Appellee that straw-mans Plaintiffs' position. Appellee claims that Plaintiffs argue that the crime-tort exception imposes <u>no</u> *mens rea* requirement, when what Plaintiffs argued is that the crime-tort exception does not impose the artificially high *mens rea* requirement that the District Court adopted. *Compare* Resp. Br. at 22 ("Plaintiffs say that the crime-tort exception … 'imposes no … *mens rea* requirement'" (second ellipsis in original)), *with* Opening Br. at 37 ("The District Court adopted Cape Cod's interpretation.… This reading of the statute contradicts its plain language, which imposes no <u>such</u> *mens rea* requirement." (emphasis added)).

As described in Plaintiffs' Opening Brief, the crime-tort exception's *mens rea* requirement is "modest" in that it does not require what Appellee suggests[1]

---

[1] Amici suggest the same and raise other arguments that echo Appellees': that Plaintiffs' position would expose the healthcare industry to financial liability; that a criminal or tortious act separate from the interception is required; and that the rule of lenity and the canon of absurdity require a ruling against Plaintiffs. Each of these arguments is addressed in this Reply Brief. Regarding the argument by the Chamber of Commerce *et al.* [Doc. 00118392450] that allowing suits like these would thwart HIPAA's "carefully balanced" statutory scheme by creating in effect a private right of action for HIPAA violations, Plaintiffs submit these amici overstate their case: The ECPA does not make all HIPAA violations

and the District Court found: that the defendant "consciously desire[d]" to "accomplish a crime or tort." Resp. Br. at 23. Rather, what is required is the "purpose" to commit an "act" that is criminal or tortious under the law—*i.e.*, to accomplish factual "results" that are in turn criminal or tortious. Plaintiffs' complaint allegations readily meet this standard.

**A. Plaintiffs' interpretation of the crime-tort exception's purpose requirement is consistent with—and in fact, called for by—the Supreme Court's precedent.**

As mentioned, the crime-tort exception excludes from the one-party consent rule interceptions done "for the *purpose* of committing any criminal or tortious *act* in violation of the Constitution or laws of the United States or of any state." 18 U.S.C. § 2511(2)(d) (emphases added). Thus, "criminal" and "tortious" are adjectives modifying the noun "act." Congress could have—but did not—require the "purpose to commit a crime or tort." "[I]t is settled beyond

---

actionable; for instance, Plaintiffs do not contend that negligent violations of HIPAA arising from, for example, a mistaken disclosure of a patient's information to the wrong insurer for reimbursement would necessarily give rise to a wiretapping claim against hospitals like Appellee. *See* 45 C.F.R § 160.404(b)(2)(i) (establishing penalty for "a violation in which it is established that the covered entity or business associate did not know and, by exercising reasonable diligence, would not have known that the covered entity or business associate violated" HIPAA's confidentiality provisions); note 2, *infra* (further discussing *mens rea* issues). But where, as here, the defendant hospital purposefully disclosed patients' HIPAA-protected PHI, there is nothing absurd about permitting affected patients to bring a wiretap claim. *See* section II.D, *infra*.

hope of contradiction that 'courts must presume that a legislature says in a statute what it means and means in a statute what it says.' Statutory interpretation begins with the language of the statute. Where, as here, that language is clear and unambiguous, the inquiry is at an end." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007) (citations omitted).

Here, "purposeful" *mens rea* has a specific meaning under the federal criminal law that does not require knowledge of illegality. Rather, "[a] person acts purposefully when he 'consciously desires' a particular *result*." *Borden v. United States*, 593 U.S. 420, 426 (2021) (citing *United States v. Bailey*, 444 U.S. 394, 404 (1980)) (emphasis added). The "result" that the defendant must "consciously desire" is the *factual* result of his conduct: In *Borden*, the Supreme Court gave the example of a person who acts with the conscious desire to run over a "reviled neighbor" with his car, giving rise to a violation of a criminal statute prohibiting the use of "physical force against the person of another." *Id.* at 432. There is no requirement that the defendant act with the purpose to violate the law. *See id.* Indeed Appellee's position runs afoul of the ancient and fundamental maxim, repeatedly affirmed by the Supreme Court, that ignorance of the law (or mistake of law) is no defense to criminal prosecution. *E.g.*, *Cheek v. United States*, 498 U.S. 192, 199 (1991).

There is, moreover, a standard category of *mens rea* that Congress could have used—but did not—in the language of the crime-tort exception had it wished to require what Defendants claim it did: When Congress proscribes a "willful" violation of the law, "'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 192 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). But in the actual statute as written, Congress did not require the "willful commission of a crime or tort" or similar—merely the "purpose" to commit an "act" that constitutes a crime or tort.

The *Kurowski* case, which Plaintiffs cited in their Opening Brief, includes the most thorough judicial analysis of which Plaintiffs are aware of the precise *mens rea* issues raised in this appeal. In *Kurowski*, the court addressed a factual and legal scenario directly analogous to that before the Court. The plaintiff brought a lawsuit against a hospital system, Rush System for Health ("Rush"), alleging that Rush deployed tracking technology like that at issue here on its websites and patient portal, and in so doing violated patients' privacy by disclosing their PHI without consent. *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2024 WL 3455020, at *1 (N.D. Ill. July 18, 2024). As Appellee does here, Rush "interpret[ed] the 'purpose' requirement of the crime-or-tort exception as requiring a party to have knowledge that its intended use of the intercepted

information is illegal." *Id.* at *3. The court rejected this argument based on the exact analysis Plaintiffs have suggested here: Noting that Congress can require a "willful" violation where it wants to proscribe actions done with knowledge of their illegality, the court explained that Rush's argument "appears to assume that the 'purpose' requirement of the crime-or-tort exception superimposes this type of willfulness requirement on top of the *mens rea* required for the underlying crime or tort." *Id.* The plaintiff, in contrast, "argues that the purpose requirement does not require Rush to have believed that its conduct violated the law; rather, it requires only that Rush's intended to use the intercepted communications in a manner proscribed by law." *Id.*

After determining that no Seventh Circuit authority addressed this issue, the court then found that there was "no persuasive reason to read a heightened willfulness requirement into the crime-or-tort exception. … [C]ourts generally interpret statutes as imposing knowledge-of-the-law requirements in cases involving 'highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct.' But the 'purpose' requirement of the statutory provision at issue here, section 2511(2)(d), applies to 'any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.' That sweeps in both sophisticated offenses and straightforward ones." *Id.* (quoting *Bryan*, 524 U.S. at 194). Moreover, the court

16

saw "no reason to presume that the *mens rea* requirements of the underlying torts or crimes do not already address concerns about separating innocent from criminal or tortious conduct. In this case, for example, the underlying HIPAA provision, section 1320d-6(a)(3), requires that Rush acted 'knowingly'—a requirement the Court has already found satisfied at the pleading stage…. The Court thus concludes that the phrase 'for the purpose of' does not require that a party act with knowledge that its intended use of the intercepted communication is illegal."[2] *Id.* at *4.

The court next analyzed more closely the meaning of "purposeful" *mens rea* in the crime-tort exception, noting that "[a] person acts purposefully when he 'consciously desires' a particular result." *Id.* (quoting *Borden*, 593 U.S. at 426). The court held that the plaintiff had "plausibly alleged that Rush acted with the 'conscious desire' to 'knowingly ... disclose[] individually identifiable health

---

[2] In *Kurowski*, the court noted that the underlying HIPAA provision at issue both there and here, 42 U.S.C. § 1320d-6(a)(3), requires that the defendant acted "knowingly." Other underlying substantive violations may contain different mental state requirements, such as the intentional disclosures required for Plaintiffs' state-law invasion of privacy claim. To be clear, Plaintiffs' argument is not that the crime-tort exception's *mens rea* requirement can override any culpable mental state required by the relevant underlying violations. Rather, Plaintiffs adequately alleged both that Appellee had the "purpose" to disclose HIPAA-protected information and that it "knowingly" did so in violation of the underlying HIPAA statute. *See id.* at *4; *cf. Stein v. Edward-Elmhurst Health*, No. 23-CV-14515, 2025 WL 580556, at *6 (N.D. Ill. Feb. 21, 2025) (discussing how the "purpose" to commit a negligent act could be met through "changing lanes on the highway without looking, and nailing the car in the other lane").

information' to a third party without authorization when it employed the tracking technology at issue in its web properties":

> First, Kurowski alleges in her complaint that Rush had at least some degree of control over what information would or would not be intercepted and transmitted…. Taking these allegations as true (as required at this stage of the case), it appears that Rush had the ability to select *which* specific pages within its web properties would intercept and transmit patients' communications to Facebook, Google, and Bidtellect, and that it actively chose to employ the tracking technology on certain pages … that were likely to contain IIHI, such as within the MyChart patient portal or on pages prompting patients to schedule appointments. Kurowski also alleges, for example, that Rush chose *not* to take measures such as anonymizing patients' IP addresses even when the tracking technology offered that option. A reasonable factfinder could infer from Rush's specific choices regarding how to employ the tracking technology that Rush "consciously desired" to intercept and transmit patients' IIHI.

*Id.* (citations omitted). All of these considerations apply with equal force to Plaintiffs' allegations here:

- Plaintiffs alleged that Appellee deployed tracking technology on its websites that disclosed patients' PHI to Google, Facebook, and other third parties. *E.g.*, Appx.742.

- Plaintiffs alleged that Appellee could and did select which pages on its websites would have tracking technology deployed, and that it chose to do so on pages that were likely to contain PHI. Appx.768-772 (alleging different pages on its website on which Appellee chose to deploy tracking

18

technology, including the physician search, appointment-making, bill payment, and treatment request form pages).

- Plaintiffs alleged that Appellee deployed tracking technology on its password-protected patient portal. Appx.751.

- Plaintiffs alleged that Appellee deliberately deployed the tracking technology in such a way as to prevent patients' being aware of or blocking the disclosures of their PHI. Appx.752.

*See also* Introduction, *supra*. As in *Kurowski*, "[a] reasonable factfinder could infer from [Appellee's] specific choices regarding how to employ the tracking technology that [Appellee] 'consciously desired' to intercept and transmit patients' IIHI." 2024 WL 3455020, at *4.

### B. Plaintiffs' interpretation of the purpose requirement is consistent with this Court's and other courts of appeals' precedent.

In support of its arguments, Appellee cites a decision of this Court that mentions without analyzing a disjunctive "primary motivation" or "determinative factor" test. Resp. Br. at 17-21. Any proper application of that test counsels reversal here. *See* Opening Br. at 34-36.

Under the "primary motivation" or "determinative factor" test, the defendant must show "(1) that the primary motivation, or (2) that a determinative factor in the actor's motivation for intercepting … was to commit a criminal, tortious, or other injurious act." *United States v. Cassiere*, 4 F.3d 1006,

1021 (1st Cir. 1993) (quoting *United States v. Vest*, 639 F. Supp. 899, 907 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987)). It is axiomatic that a judicial gloss cannot override the plain language of a statute, *e.g.*, *Ruiz*, 496 F.3d at 8, and in any event courts' formulation of this test is grammatically parallel to the statute in that it requires the "motivation" to commit an "act" that is criminal or tortious. The "motivation" courts examine maps to the "purpose" required in the statute; thus it is that the court in *Caro* found that "Congress chose the word 'purpose' for a reason. … [T]he offender must have as her objective a tortious or criminal *result*." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) (emphasis added); *accord Vest*, 639 F. Supp. at 904 (holding that the primary motivation or a determinative factor in the actor's motivation for intercepting must be "to commit a criminal, tortious, or other injurious *act*" (emphasis added)).[3]

---

[3] In *Caro*, the Second Circuit addressed state-law invasion of privacy claims stemming from the defendant's secretly recording a conversation with the plaintiff. The court held that the crime-tort exception did not apply because the alleged tort stemmed from "the simple act of the recording *itself*," which was the same act as the alleged interception. 618 F.3d at 101. The case is therefore distinguishable here because Plaintiffs' claim is based on Appellee's separate disclosure of their communications. *See* section III, *infra*.

The *Desnick* case cited by Appellee is likewise distinguishable. There, the plaintiff brought claims against a news agency that secretly recorded interactions with his practice as part of an exposé into allegedly improper medical procedures. *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1348 (7th Cir. 1995). The court held that this was insufficient to trigger the crime-tort exception with the

Here, Plaintiffs have alleged facts showing that Appellee chose to deploy tracking technology on certain pages on its web properties for the purpose of disclosing its patients' communications, including their PHI, to third parties *See* Introduction and section I.A, *supra*. Plaintiffs also made allegations regarding Appellee's motivation, as for example in the following paragraph:

> By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shares the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

Appx.775.

These allegations are more than sufficient to permit a reasonable factfinder to infer that Appellee's "conscious desire" to disclose patients' PHI was either (1) the "primary motivation" or (2) a "determinative factor" in Appellee's motivation to deploy tracking technologies on its website. *E.g.*, *Vest*, 639 F. Supp. at 907 (holding that dual purpose of keeping a record of payment and

---

predicate tort of defamation because there was "no suggestion that the defendants sent the testers into the Wisconsin and Illinois offices for the purpose of defaming the plaintiffs…. The purpose, by the plaintiffs' own account, was to see whether the Center's physicians would recommend cataract surgery on the testers. By the same token it was not to injure the Desnick Eye Center…. Telling the world the truth about a Medicare fraud is hardly what the framers of the statute could have had in mind…." *Id.* at 1353–54.

acting in furtherance of a criminal conspiracy to blackmail sufficed to bring allegations within crime-tort exception under the "primary motivation" or "determinative factor" test).

*Kurowski* is again instructive here. After analyzing the *mens rea* issues discussed above, the *Kurowski* court rejected Rush's argument that "it did not act with the requisite purpose because it employed the tracking technologies at issue for a 'financial motive.'" 2024 WL 3455020, at *5. "Many crimes and torts are motivated by a desire to make money, and 'it defies common sense that a clearly harmful act could escape liability as long as it was done for profit.'" *Id.* (quoting *Mekhail v. N. Mem'l Health Care*, No. 23 C 00440, 2024 WL 1332260, at *5 n.4 (D. Minn. Mar. 28, 2024)). Further, "nothing in section 2511(2)(d) requires that a party act with the *sole* purpose of committing the underlying crime or tort. Thus, even if the Court views Rush's 'purpose' in employing the tracking technologies as, for example, improving its advertising outcomes and its profit margins, that does not mean that it didn't also 'consciously desire' to make unauthorized disclosures of Kurowski's IIHI to achieve that goal." *Id.* So too here.

**II. Plaintiffs' interpretation of the purpose requirement is consistent with the plain language of the ECPA, is grammatical, and honors legislative history.**

**A. Plaintiffs' interpretation renders no words superfluous.**

Appellee claims that Plaintiffs do violence to the plain language of the statute by not giving effect to the adjectives "criminal or tortious." Resp. Br. at 25–27 (citing canon of superfluity). Appellee again straw-mans Plaintiffs' brief. Plaintiffs clearly state that "the relevant 'purpose' must be to 'commit[]' an 'act' that is either criminal *or* tortious," Opening Br. at 37 (emphasis in original), not that "the defendant's 'purpose' need not be criminal or tortious." Resp. Br. at 26 (purporting to cite the Opening Brief); *see also* Section I.A, *supra* ("criminal" and "tortious" are adjectives modifying "act").

Appellee compounds its error by attempting to show superfluousness but failing. Resp. Br. at 26. Under Plaintiffs' interpretation, the adjectives "criminal or tortious" cannot be stricken from 18 U.S.C. § 2511(2)(d) without changing the crime-tort exception's meaning. Without the "criminal or tortious" modifier, an act in violation of federal or state law would be unlawful as an *actus reus* alone—even without *mens rea*. Plaintiffs advocate for no such construction. *See, e.g.*, Opening Br. at 32 ("Consistent with the foregoing, courts across the country have found that pleading a purpose to violate HIPAA triggers the crime-tort exception."); *accord Elonis v. United States*, 575 U.S. 723, 735 (2015) ("a defendant

generally must 'know the facts that make his conduct fit the definition of the offense,' … even if he does not know that those facts give rise to a crime" (quoting *Staples v. United States,* 511 U.S. 600, 608 n.3 (1994))). Because Plaintiffs' interpretation gives effect to every word in the statute, Appellee's accusation of superfluity falls flat.

## B. Plaintiffs' interpretation is grammatical.

Appellee argues that Plaintiffs' interpretation is "grammatically incorrect" but then fails to identify any rule of grammar that supposedly is violated. *See* Resp. Br. at 27–28. In fact, the proper application of grammatical concepts supports Plaintiffs' interpretation. *Castaneda v. Souza*, 810 F.3d 15, 47 (1st Cir. 2015) ("[I]f a straightforward reading of the text employing basic, conventional usages of grammar points directly at a given interpretation, it should take some pretty heavy lifting to reject that interpretation."). "[C]riminal or tortious act" is the direct object of the gerund "committing," and the entire prepositional phrase "of committing any criminal or tortious act" serves to complete or specify the meaning of the abstract noun "purpose." *See, e.g.*, *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 74–75 (2017) (considering roles gerunds and prepositional phrases play in statutory language). Stated differently, "the relevant 'purpose' must be to 'commit[]' an 'act' that is either criminal *or* tortious," just as Plaintiffs plainly

24

stated months ago. Opening Br. at 37 (emphasis in original); *see also Stein*, 2025 WL 580556, at *4.

In contrast, proper grammar does not support a reading that the ECPA requires a "primary motivation" or "determinative factor" of committing a crime or tort that can be nullified by an innocuous motivation (as the District Court held), Appx.8, or that defendants intended generally to do wrong (as Appellee now appears to argue), Resp. Br. at 28. Likewise, that "commit" typically precedes a direct object with a negative connotation does not mean "'for the purpose of committing a criminal or tortious act' is best understood to mean acting with the intent to do wrong." *Id.* The word "committing" is not a *mens rea* term. *Cf. United States v. Krause*, 914 F.3d 1122, 1127 (8th Cir. 2019) ("The mens rea of 'willfully' modifies only 'injure or commit'" in the statutory phrase "willfully injures or commits any depredation against any property of the United States"). It merely expresses the existence of two types of unlawful purpose: criminal acts in violation of federal and state law; or tortious acts in violation of federal or state law. There is no more elegant way to express the existence of these categories because in English "to crime" and "to tort" are not intransitive verbs, or indeed verbs at all.

In sum, Plaintiffs' interpretation is grammatical; Appellee's, nonsensical.

## C. Appellee misstates Plaintiffs' position on legislative history.

Plaintiffs do not argue that there is no *mens rea* requirement, but rather that the sort of *mens rea* the District Court imposed is improper. *See* Opening Br. at 38–39. Appellee accuses Plaintiffs of misreading the legislative history when noting that Congress struck the phrase "for the purpose of committing any other injurious act" from the statute. *See* Resp. Br. at 31–32. But Appellee ignores the key point: If Congress intended to require proof that a defendant consciously desired to harm someone else (*i.e.*, "I want to commit a crime today"), it would have retained language focused on "injurious" purpose. Instead, Congress focused the exception on the purpose of committing "criminal or tortious act[s]." *See* 18 U.S.C. § 2511(2)(d); *see also Stein*, 2025 WL 580556, at *5.

By similar token, Senator Hart's objections to an earlier version of the Wiretap Act underscore the error in the District Court's (and now Appellee's) reasoning. As recounted by the Second Circuit, the crime-tort exception was added after the Senator expressed concern over interceptions done "for insidious purposes such as blackmail, stealing business secrets, or other criminal or tortious acts in violation of Federal or State laws." *Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010) (quoting S. Rep. No. 90–1097, 1968 U.S.C.C.A.N. 2112, at 2182 (1968)). The examples of "blackmail" and "stealing business secrets" are instructive: theft for profit is no less criminal because it is commercially

motivated. HIPAA violations and state privacy torts are no less wrongful when done for improved marketing. Resp. Br. at 30 ("advertising technology … is a marketing tool"). The legislative history supports, rather than undermines, Plaintiffs' arguments.

**D.      Appellee's absurdity and rule of lenity arguments lack merit.**

This Court need not defer to other canons of construction when the text of the statute is clear. *See, e.g.*, *Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 40 (1st Cir. 2020). There is only one, clear interpretation of the ECPA: a defendant is liable for intercepting communications without authorization when done for the purpose of committing criminal or tortious acts.

In any event, there is nothing absurd about expecting a hospital to refrain from disclosing patients' health information to third parties without patient consent. Indeed, this is a bedrock tenet of the ethical and legal obligations that apply to healthcare providers in this country. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know." Appx.782. The American Medical Association's ("AMA's") Code of Medical Ethics also contains many rules protecting the privacy of patient data and communications. For example, the AMA has issued medical ethics opinions providing that

> [p]rotecting information gathered in association with the care of a patient is a core value in health care. …

> Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware.

Appx.782. State and federal law alike acknowledge the importance of patient confidentiality and (attempt to) protect it in myriad ways. *See, e.g.*, G.L. c. 111, § 70E (Patients' and Residents' Rights); 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.102 *et seq.*; *Alberts v. Devine*, 395 Mass. 59, 65 (1985) (patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." (quoting *MacDonald v. Clinger,* 84 A.D.2d 482, 483 (N.Y. 1982))).

The conduct alleged here is not "commonplace" or "innocuous." *See* Resp. Br. at 34. It was done secretly, in violation of Appellee's ethical and legal obligations, for Appellee's financial gain. Appx.744-745; Appx.768-778; *see also* 42 U.S.C. § 1320d-6. Requiring regulated entities to follow the law is not going to lead to the parade of horribles about which Appellee warns. Appellee cites to zero real-world examples of "bankruptc[ies]" or "prison convictions," despite years of courts around the country holding wrongdoers (including non-profit

hospitals) accountable for their misconduct in accordance with the plain text of wiretapping statutes and HIPAA. Resp. Br. at 33–34.

Nor is there sound reason to fear that any website operator using advertising technology could face ECPA liability. *See* Resp. Br. at 33–34. Or that any wrongdoer in a two-party consent state would be prosecuted under ECPA. *See id.* at 35. Appellee glosses over a critical distinction: not all website operators are HIPAA-covered entities with statutory obligations to protect patient health information. *See* 45 C.F.R. § 160.103 (defining "covered entity"). And not all websites, whether operated by private or public actors (*e.g.*, the "Basics: Get Started with Medicare" webpage cited by Appellee), require or entice patients to share protected health information, as Appellee did here. Appellee, as a healthcare provider, is subject to heightened duties under federal law, and its knowing disclosure of protected health information for commercial advantage is a crime under 42 U.S.C. § 1320d-6(b)(3). There is nothing absurd about holding Appellee, a HIPAA-regulated entity, accountable for misconduct that Congress saw fit to criminalize.

It comes as no surprise, then, that Appellee fails to cite any data privacy case in which a court—circuit or district, reported or not—actually endorsed its absurdity argument. *See* Resp. Br. at 32–35. Requiring hospitals to take care to protect patient health information is altogether sensible.

Appellee's rule of lenity argument fares no better. *See* Resp. Br. at 35–36. The rule of lenity applies only when there is "grievous ambiguity" in a statute. *See* Resp. Br. at 35 (citing *United States v. Councilman*, 418 F.3d 67, 83 (1st Cir. 2005)). No such ambiguity exists here. Appellee admits as much: "the crime-tort exception is unambiguous." Resp. Br. at 35–36; *accord* Opening Br. at 31–34 (discussing plain language of crime-tort exception). And the cited "split" among district courts is no evidence at all of grievous ambiguity. *Compare* Resp. Br. at 36, *with* U*nited States v. Toth*, 33 F.4th 1, 15 n.10 (1st Cir. 2022) ("A statute is not 'ambiguous' for purposes of lenity merely because there is a division of judicial authority over its proper construction.") (quoting *Reno v. Kor*ay, 515 U.S. 50, 64–65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995)).

## III. Plaintiffs alleged an intended crime and tort separate from the interception.

In asserting that Appellants pleaded no crime separate from an interception, Appellee and the District Court misunderstand Appellant's pleadings and the technical reality of tracking technologies. These technologies separately intercept and then disclose communications as part of a multi-step process:

> Step 1 – When a user visits a website with tracking code, the code is deposited onto the user's browser.

> Step 2 – When a user sends a communication to that website, the tracking code is triggered. The code acquires the outgoing

communication and associated data while still on the user's browser. At that moment, the interception is complete and the communication can be rerouted or otherwise manipulated by the tracking technology.

Step 3 – Most tracking technologies, including those at issue in this case, then force the user's browser to send a separate transmission to third parties, including the previously intercepted communication and related data.

Appellants consistently pleaded how this multi-step process resulted in separate interceptions and disclosures when patients used Appellee's web properties. Tracking technologies Appellee used like the Meta Pixel both "capture[] *and* disclose[]" information to third parties. Appx.634 (emphasis added). First, the "capture" occurs when the pixels that "lie in wait … are triggered by an event." Appx.623. At that instant, the tracking code first harvests the user's communications by "replicat[ing]" the "user data" that was shared with the Defendants' web properties. Appx.633. This interception occurs "through scripts running in a user's internet browser." Appx.636. Then, once the code on the browser has completed the acquisition, the tracking code "takes the information it harvests and sends it to [the third party] with personally identifiable information." Appx.637. Through this two step process, Appellee "acquired ... and forwarded to Facebook" and other third parties their patients' sensitive communications and PHI. Appx.643.

The ECPA recognizes that these two stages, the acquisition and the disclosure, are distinct. The first stage is the interception itself. 18 U.S.C. § 2510(4) ("intercept" means the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."). The second stage is a subsequent use of the intercepted information. Indeed, the ECPA treats "interception" and "disclosure" as separate acts, each of which can trigger liability under different subsections of the ECPA. 18 U.S.C. § 2511(a), (c) (violator includes person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.").

Appellee misreads the pleadings when it asserts that Appellant's allegation that "the acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients" shows that the disclosure and interception are not independent. *Cf.* Resp. Brief at 38 (quoting Appx.768). This allegation states that interception and disclosure occur while the *communication* is ongoing, not that interception and disclosure

occur simultaneously with each other. The interception must occur while the communication is ongoing for the wiretapping sections of the ECPA to apply at all. *Boudreau v. Lussier*, 901 F.3d 65, 78 (1st Cir. 2018) (holding that ECPA does not apply to the "acquisition of no-longer-in-transit communications."). Therefore, this allegation only confirms the viability of Plaintiffs' claims; it does not undermine them.

None of the other allegations that Appellees cite change the analysis:

- SAC ¶¶ 104 and 139 (Appx.761 and Appx.770) only reinforce that the *transmission* to the third party is contemporaneous with the interception and disclosure;

- SAC ¶ 158 (Appx.777) merely indicates that Facebook ultimately received the contents of patients' communications along with their PHI/PII; and

- SAC ¶ 163 (Appx.778) is entirely inapposite because it discusses the warnings that Google gives to health care providers about not using Google Analytics in the illicit ways that Defendants did in this case.

Appellee nevertheless maintains that the "transmission from Plaintiffs' computers to Google or Facebook was both the interception and the disclosure." Resp. Br. at 38. It offers no citation to the Complaint to support this assertion. That is because the allegation does not exist. Appellee cannot rewrite the Complaint to justify the District Court's erroneous decision.

It is undisputed that Plaintiffs pleaded that "the AdTech directed Plaintiffs' browsers to send an additional transmission, containing data about Plaintiffs' website activity, directly to Google or Facebook." Opening Br. at 38. This additional transmission, which occurs *after* the tracking code on Plaintiffs' browsers acquire their communications, is sufficiently independent from the interception to support the crime-tort exception.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Opening Brief, this Court should reverse.

Respectfully submitted,

/s/ *Antonio X. Milton*
Antonio X. Milton
First Circuit Bar Number 1218904
Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
Ahmad Zavitsanos & Mensing, P.L.L.C.
1221 McKinney Street
Houston, TX 77010
amilton@azalaw.com
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

J. Tucker Merrigan, BBO# 681627
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
adj@kellerpostman.com

COUNSEL FOR APPELLANTS,
INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY
SITUATED

**CERTIFICATE OF SERVICE**

I certify that on February 2, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system and that all parties or their counsel of record that are registered as ECF Filers will be served by the CM/ECF system.

/s/ Antonio Xavier Milton
Antonio X. Milton

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), and 1st CIR. R. 32.1: this document contains 6,493 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 1st CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt Calisto MT.

/s/ Antonio Xavier Milton
Antonio X. Milton